# NATIONAL LABOR RELATIONS BOARD *v.* YESHIVA UNIVERSITY

No. 78–857.   Argued October 10, 1979—Decided February 20, 1980*

*Together with No. 78–997, *Yeshiva University Faculty Assn.* v. *Yeshiva University,* also on certiorari to the same court.

Powell, J., delivered the opinion of the Court, in which Burger, C. J., and Stewart, Rehnquist, and Stevens, JJ., joined. Brennan, J., filed a dissenting opinion, in which White, Marshall, and Blackmun, JJ., joined, *post*, p. 691.

*Norton J. Come* argued the cause for petitioner in No. 78–857. With him on the briefs were *Solicitor General McCree, Deputy Solicitor General Wallace, Stephen M. Shapiro, John*

S. *Irving, Robert E. Allen, Linda Sher,* and *David S. Fish-back. Ronald H. Shechtman* argued the cause for petitioner in No. 78–997. With him on the brief was *Murray A. Gordon.*

*Marvin E. Frankel* argued the cause for respondent in both cases. With him on the brief were *Saul G. Kramer, Mark L. Goldstein,* and *Gerald A. Bodner.*†

MR. JUSTICE POWELL delivered the opinion of the Court.

Supervisors and managerial employees are excluded from the categories of employees entitled to the benefits of collective bargaining under the National Labor Relations Act.[1] The question presented is whether the full-time faculty of Yeshiva University fall within those exclusions.

I

Yeshiva is a private university which conducts a broad range of arts and sciences programs at its five undergraduate and eight graduate schools in New York City. On October 30, 1974, the Yeshiva University Faculty Association (Union) filed a representation petition with the National Labor Relations Board (Board). The Union sought certification as bargaining agent for the full-time faculty members at 10 of the 13

---

† Briefs of *amici curiae* urging reversal were filed by *Woodley B. Osborne, Victor J. Stone,* and *Robert A. Goldstein* for the American Association of University Professors; and by *Donald H. Wollett* and *Robert H. Chanin* for the National Education Association.

Briefs of *amici curiae* urging affirmance were filed by *Estelle A. Fishbein, Fred Vinson, Daniel Riesel,* and *David Sive* for Johns Hopkins University et al.; and by *Kenneth C. McGuiness, Robert E. Williams,* and *Daniel R. Levinson* for the National Society of Professional Engineers.

*Lawrence A. Poltrock* filed a brief in No. 78–857 for the American Federation of Teachers, AFL–CIO, as *amicus curiae.*

[1] 49 Stat. 449, as amended, 61 Stat. 136, 73 Stat. 519, 29 U. S. C. § 151 *et seq.;* see 29 U. S. C. §§ 152 (3), 152 (11), 164 (a); *NLRB* v. *Bell Aerospace Co.,* 416 U. S. 267 (1974).

schools.[2] The University opposed the petition on the ground that all of its faculty members are managerial or supervisory personnel and hence not employees within the meaning of the National Labor Relations Act (Act). A Board-appointed hearing officer held hearings over a period of five months, generating a voluminous record.

The evidence at the hearings showed that a central administrative hierarchy serves all of the University's schools. Ultimate authority is vested in a Board of Trustees, whose members (other than the President) hold no administrative positions at the University. The President sits on the Board of Trustees and serves as chief executive officer, assisted by four Vice Presidents who oversee, respectively, medical affairs and science, student affairs, business affairs, and academic affairs. An Executive Council of Deans and administrators makes recommendations to the President on a wide variety of matters.

University-wide policies are formulated by the central administration with the approval of the Board of Trustees, and include general guidelines dealing with teaching loads, salary scales, tenure, sabbaticals, retirement, and fringe benefits. The budget for each school is drafted by its Dean or Director, subject to approval by the President after consultation with a committee of administrators.[3] The faculty participate

[2] The schools involved are Yeshiva College, Stern College for Women, Teacher's Institute for Women, Erna Michael College, Yeshiva Program, James Striar School of General Jewish Studies, Belfer Graduate School of Sciences, Ferkauf Graduate School of Humanities and Social Sciences, Wurzweiler School of Social Work, and Bernard Revel Graduate School. The Union did not seek to represent the faculty of the medical school, the graduate school of medical sciences, the Yeshiva High School, or any of the theological programs affiliated with the University. A law school has been opened since the time of the hearings, but it does not figure in this case.

[3] At Yeshiva College, budget requests prepared by the senior professor in each subject area receive the "perfunctory" approval of the Dean "99 percent" of the time and have never been rejected by the central administration. App. 298–299. A council of elected department chairmen at

in University-wide governance through their representatives on an elected student-faculty advisory council. The only University-wide faculty body is the Faculty Review Committee, composed of elected representatives who adjust grievances by informal negotiation and also may make formal recommendations to the Dean of the affected school or to the President. Such recommendations are purely advisory.

The individual schools within the University are substantially autonomous. Each is headed by a Dean or Director, and faculty members at each school meet formally and informally to discuss and decide matters of institutional and professional concern. At four schools, formal meetings are convened regularly pursuant to written bylaws. The remaining faculties meet when convened by the Dean or Director. Most of the schools also have faculty committees concerned with special areas of educational policy. Faculty welfare committees negotiate with administrators concerning salary and conditions of employment. Through these meetings and committees, the faculty at each school effectively determine its curriculum, grading system, admission and matriculation standards, academic calendars, and course schedules.[4]

---

Ferkauf approves the school's budget allocations when discretionary funds are available. *Id.,* at 626–627. All of these professors were included in the bargaining unit approved by the Board.

[4] For example, the Deans at Yeshiva and Erna Michael Colleges regard faculty actions as binding. *Id.,* at 248–249, 312–313. Administrators testified that no academic initiative of either faculty had been vetoed since at least 1968. *Id.,* at 250, 313. When the Stern College faculty disagreed with the Dean's decision to delete the education major, the major was reinstituted. *Id.,* at 191. The Director of the Teacher's Institute for Women testified that "the faculty is the school," *id ,* at 379, while the Director of the James Striar School described his position as the "executive arm of the faculty," which had overruled him on occasion, *id.,* at 360–361. All decisions regarding academic matters at the Yeshiva Program and Bernard Revel are made by faculty consensus. *Id.,* at 574, 583–586. The "internal operation of [Wurzweiler] has been heavily governed by faculty decisions," according to its Dean. *Id.,* at 502.

Faculty power at Yeshiva's schools extends beyond strictly academic concerns. The faculty at each school make recommendations to the Dean or Director in every case of faculty hiring, tenure, sabbaticals, termination and promotion. Although the final decision is reached by the central administration on the advice of the Dean or Director, the overwhelming majority of faculty recommendations are implemented.[5] Even when financial problems in the early 1970's restricted Yeshiva's budget, faculty recommendations still largely controlled personnel decisions made within the constraints imposed by the administration. Indeed, the faculty of one school recently drew up new and binding policies expanding their own role in these matters. In addition, some faculties make final decisions regarding the admission, expulsion, and graduation of individual students. Others have decided questions involving teaching loads, student absence policies, tuition and enrollment levels, and in one case the location of a school.[6]

------

[5] One Dean estimated that 98% of faculty hiring recommendations were ultimately given effect. *Id.*, at 624. Others could not recall an instance when a faculty recommendation had been overruled. *Id.*, at 193–194. At Stern College, the Dean in six years has never overturned a promotion decision. *Ibid.* The President has accepted all decisions of the Yeshiva College faculty as to promotions and sabbaticals, including decisions opposed by the Dean. *Id.*, at 268–270. At Erna Michael, the Dean has never hired a full-time faculty member without the consent of the affected senior professor, *id.*, at 333–335, and the Director of Teacher's Institute for Women stated baldly that no teacher had ever been hired if "there was the slightest objection, even on one faculty member's part." *Id.*, at 388. The faculty at both these schools have overridden recommendations made by the deans. No promotion or grant of tenure has ever been made at Ferkauf over faculty opposition. *Id.*, at 620, 633. The Dean of Belfer testified that he had no right to override faculty decisions on tenure and nonrenewal. *Id.*, at 419.

[6] The Director of Teacher's Institute for Women once recommended that the school move to Brooklyn to attract students. The faculty rejected the proposal and the school remained in Manhattan. *Id.*, at 379–380.

## II

A three-member panel of the Board granted the Union's petition in December 1975, and directed an election in a bargaining unit consisting of all full-time faculty members at the affected schools. 221 N. L. R. B. 1053. The unit included Assistant Deans, senior professors, and department chairmen, as well as associate professors, assistant professors, and instructors.[7] Deans and Directors were excluded. The Board summarily rejected the University's contention that its entire faculty are managerial, viewing the claim as a request for reconsideration of previous Board decisions on the issue. Instead of making findings of fact as to Yeshiva, the Board referred generally to the record and found no "significan[t]" difference between this faculty and others it had considered. The Board concluded that the faculty are professional employees entitled to the protection of the Act because "faculty participation in collegial decision making is on a collective rather than individual basis, it is exercised in the faculty's own interest rather than 'in the interest of the employer,' and final authority rests with the board of trustees." *Id.,* at 1054 (footnote omitted).[8]

---

[7] "Full-time faculty" were defined as those

"appointed to the University in the titles of professor, associate professor, assistant professor, instructor, or any adjunct or visiting thereof, department chairmen, division chairmen, senior faculty and assistant deans, but excluding . . . part-time faculty; lecturers; principal investigators; deans, acting deans and directors; [and others not relevant to this action]." 221 N. L. R. B., at 1057.

The term "faculty" in this opinion refers to the members of this unit as defined by the Board.

[8] Identical language had been employed in at least two other Board decisions. See *infra,* at 684–685. In this case, it was not supported by a single citation to the record. MR. JUSTICE BRENNAN's dissent relies on this language, *post,* at 696, and adds that a faculty's "primary concerns are academic and relate solely to its own professional reputation," *post,* at 701. The view that faculty governance authority "is exercised in the

The Union won the election and was certified by the Board. The University refused to bargain, reasserting its view that the faculty are managerial. In the subsequent unfair labor practice proceeding, the Board refused to reconsider its holding in the representation proceeding and ordered the University to bargain with the Union. 231 N. L. R. B. 597 (1977). When the University still refused to sit down at the negotiating table, the Board sought enforcement in the Court of Appeals for the Second Circuit, which denied the petition. 582 F. 2d 686 (1978).

Since the Board had made no findings of fact, the court examined the record and related the circumstances in considerable detail. It agreed that the faculty are professional employees under § 2 (12) of the Act. 29 U. S. C. § 152 (12). But the court found that the Board had ignored "the extensive control of Yeshiva's faculty" over academic and personnel decisions as well as the "crucial role of the full-time faculty in determining other central policies of the institution." 582 F. 2d, at 698. The court concluded that such power is not an exercise of individual professional expertise. Rather, the faculty are, "in effect, substantially and pervasively operating the enterprise." *Ibid.* Accordingly, the court held that the faculty are endowed with "managerial status" sufficient to remove them from the coverage of the Act. We granted certiorari, 440 U. S. 906 (1979), and now affirm.

## III

There is no evidence that Congress has considered whether a university faculty may organize for collective bargaining under the Act. Indeed, when the Wagner and Taft-Hartley Acts were approved, it was thought that congressional power did not extend to university faculties because they were employed by nonprofit institutions which did not "affect com-

---

faculty's own interest" rather than that of the University assumes a lack of responsibility that certainly is not reflected in this record.

merce." See *NLRB* v. *Catholic Bishop of Chicago,* 440 U. S. 490, 504–505 (1979).[9] Moreover, the authority structure of a university does not fit neatly within the statutory scheme we are asked to interpret. The Board itself has noted that the concept of collegiality "does not square with the traditional authority structures with which th[e] Act was designed to cope in the typical organizations of the commercial world." *Adelphi University,* 195 N. L. R. B. 639, 648 (1972).

The Act was intended to accommodate the type of management-employee relations that prevail in the pyramidal hierarchies of private industry. *Ibid.* In contrast, authority in the typical "mature" private university is divided between a central administration and one or more collegial bodies. See J. Baldridge, Power and Conflict in the University 114 (1971). This system of "shared authority" evolved from the medieval model of collegial decisionmaking in which guilds of scholars were responsible only to themselves. See N. Fehl, The Idea of a University in East and West 36–46 (1962); D. Knowles, The Evolution of Medieval Thought 164–168 (1962). At early universities, the faculty were the school. Although faculties have been subject to external control in the United States since colonial times, J. Brubacher & W. Rudy, Higher Education in Transition: A History of American Colleges and Universities, 1636–1976, pp. 25–30 (3d ed. 1976), traditions of collegiality continue to play a significant role at many universities, including Yeshiva.[10] For these reasons, the Board has

---

[9] See also S. Rep. No. 573, 74th Cong., 1st Sess., 7 (1935) (dispute between employer and college professor would not be covered); H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess., 36 (1947) (listing professional employees covered by new statutory provision without mentioning teachers); S. Rep. No. 105, 80th Cong., 1st Sess., 11, 19 (1947) (same).

[10] See the inaugural address of Williams College President Paul Ansel Chadbourne, quoted in Kahn, The NLRB and Higher Education: The Failure of Policymaking Through Adjudication, 21 UCLA L. Rev. 63, 70, n. 16 (1973) (" 'Professors are sometimes spoken of as working for the college. They *are* the college' ") (emphasis in original); Davis, Unions

recognized that principles developed for use in the industrial setting cannot be "imposed blindly on the academic world." *Syracuse University,* 204 N. L. R. B. 641, 643 (1973).

The absence of explicit congressional direction, of course, does not preclude the Board from reaching any particular type of employment. See *NLRB* v. *Hearst Publications, Inc.,* 322 U. S. 111, 124–131 (1944). Acting under its responsibility for adapting the broad provisions of the Act to differing workplaces, the Board asserted jurisdiction over a university for the first time in 1970. *Cornell University,* 183 N. L. R. B. 329 (1970). Within a year it had approved the formation of bargaining units composed of faculty members. *C. W. Post Center,* 189 N. L. R. B. 904 (1971).[11] The Board reasoned that faculty members are "professional employees" within the meaning of § 2 (12) of the Act and therefore are entitled to the benefits of collective bargaining. 189 N. L. R. B., at 905; 29 U. S. C. § 152 (12).[12]

Yeshiva does not contend that its faculty are not professionals under the statute. But professionals, like other employees, may be exempted from coverage under the Act's ex-

---

and Higher Education: Another View, 49 Ed. Record 139, 143 (1968) ("The president . . . is not the faculty's master. He is as much the faculty's administrator as he is the board [of trustees']"); n. 4, *supra.*

[11] The Board has suggested that Congress tacitly approved the formation of faculty units in 1974, when the Act was amended to eliminate the exemption accorded to nonprofit hospitals. Although Congress appears to have agreed that nonprofit institutions "affect commerce" under modern economic conditions, H. R. Rep. No. 93–1051, p. 4 (1974); 120 Cong. Rec. 12938 (1974) (remarks of Sen. Williams), there is nothing to suggest that Congress considered the status of university faculties.

[12] The Act provides broadly that "employees" have organizational and other rights. 29 U. S. C. § 157. Section 2 (3) defines "employee" in general terms, 29 U. S. C. § 152 (3); § 2 (12) defines "professional employee" in some detail, 29 U. S. C. § 152 (12); and § 9 (b)(1) prohibits the Board from creating a bargaining unit that includes both professional and nonprofessional employees unless a majority of the professionals vote for inclusion, 29 U. S. C. § 159 (b)(1).

clusion for "supervisors" who use independent judgment in overseeing other employees in the interest of the employer,[13] or under the judicially implied exclusion for "managerial employees" who are involved in developing and enforcing employer policy.[14]   Both exemptions grow out of the same concern: That an employer is entitled to the undivided loyalty of its representatives.   *Beasley* v. *Food Fair of North Carolina,* 416 U. S. 653, 661–662 (1974); see *NLRB* v. *Bell Aerospace Co.,* 416 U. S. 267, 281–282 (1974).   Because the Court of Appeals found the faculty to be managerial employees, it did not decide the question of their supervisory status.   In view of our agreement with that court's application of the managerial exclusion, we also need not resolve that issue of statutory interpretation.

## IV

Managerial employees are defined as those who " 'formulate and effectuate management policies by expressing and making operative the decisions of their employer.' "   *NLRB* v. *Bell Aerospace Co., supra,* at 288 (quoting *Palace Laundry Dry Cleaning Corp.,* 75 N. L. R. B. 320, 323, n. 4 (1947)).   These employees are "much higher in the managerial structure" than those explicitly mentioned by Congress, which "regarded [them] as so clearly outside the Act that no specific exclusionary provision was thought necessary."   416 U. S., at 283.

---

[13] An employee may be excluded if he has authority over any one of 12 enumerated personnel actions, including hiring and firing.  29 U. S. C. §§ 152 (3), 152 (11), 164 (a).   The Board has held repeatedly that professionals may be excluded as supervisors.   *E. g., University of Vermont,* 223 N. L. R. B. 423, 426 (1976); *Presbyterian Medical Center,* 218 N. L. R. B. 1266, 1267–1269 (1975).

[14] *NLRB* v. *Bell Aerospace Co.,* 416 U. S. 267 (1974).   The Board never has doubted that the managerial exclusion may be applied to professionals in a proper case.   *E. g., Sutter Community Hospitals of Sacramento,* 227 N. L. R. B. 181, 193 (1976); see *General Dynamics Corp.,* 213 N. L. R. B. 841, 857–858 (1974); *Westinghouse Electric Corp.,* 113 N. L. R. B. 337, 339 (1955).

Managerial employees must exercise discretion within, or even independently of, established employer policy and must be aligned with management. See *id.*, at 286–287 (citing cases). Although the Board has established no firm criteria for determining when an employee is so aligned, normally an employee may be excluded as managerial only if he represents management interests by taking or recommending discretionary actions that effectively control or implement employer policy.[15]

The Board does not contend that the Yeshiva faculty's decisionmaking is too insignificant to be deemed managerial.[16] Nor does it suggest that the role of the faculty is merely advisory and thus not managerial.[17] Instead, it contends that the managerial exclusion cannot be applied in a straightforward fashion to professional employees because those em-

---

[15] *E. g., Sutter Community Hospitals of Sacramento, supra,* at 193; *Bell Aerospace,* 219 N. L. R. B. 384, 385–386 (1975) (on remand); *General Dynamics Corp., supra,* at 857; see *NLRB* v. *Bell Aerospace Co., supra,* at 274, 286–289.

[16] The Board has found decisions of far less significance to the employer to be managerial when the affected employees were aligned with management. *Swift & Co.,* 115 N. L. R. B. 752, 753 (1956) (procurement drivers who made purchases for employers); *Firestone Tire & Rubber Co.,* 112 N. L. R. B. 571, 573 (1955) (production schedulers); *Peter Kiewit Sons' Co.,* 106 N. L. R. B. 194, 196 (1953) (lecturers who indoctrinated new employees); *Western Electric Co.,* 100 N. L. R. B. 420, 423 (1952) (personnel investigators who made hiring recommendations); *American Locomotive Co.,* 92 N. L. R. B. 115, 116–117 (1950) (buyers who made substantial purchases on employer's behalf).

[17] The Union does argue that the faculty's authority is merely advisory. But the fact that the administration holds a rarely exercised veto power does not diminish the faculty's effective power in policymaking and implementation. See nn. 4, 5, *supra.* The statutory definition of "supervisor" expressly contemplates that those employees who "effectively . . . recommend" the enumerated actions are to be excluded as supervisory. 29 U. S. C. § 152 (11). Consistent with the concern for divided loyalty, the relevant consideration is effective recommendation or control rather than final authority. That rationale applies with equal force to the managerial exclusion.

ployees often appear to be exercising managerial authority when they are merely performing routine job duties. The status of such employees, in the Board's view, must be determined by reference to the "alignment with management" criterion. The Board argues that the Yeshiva faculty are not aligned with management because they are expected to exercise "independent professional judgment" while participating in academic governance, and because they are neither "expected to conform to management policies [nor] judged according to their effectiveness in carrying out those policies." Because of this independence, the Board contends there is no danger of divided loyalty and no need for the managerial exclusion. In its view, union pressure cannot divert the faculty from adhering to the interests of the university, because the university itself expects its faculty to pursue professional values rather than institutional interests. The Board concludes that application of the managerial exclusion to such employees would frustrate the national labor policy in favor of collective bargaining.

This "independent professional judgment" test was not applied in the decision we are asked to uphold. The Board's opinion relies exclusively on its previous faculty decisions for both legal and factual analysis. 221 N. L. R. B., at 1054. But those decisions only dimly foreshadow the reasoning now proffered to the Court. Without explanation, the Board initially announced two different rationales for faculty cases,[18]

---

[18] Two cases simply announced that faculty authority is neither managerial nor supervisory because it is exercised collectively. *C. W. Post Center*, 189 N. L. R. B. 904, 905 (1971); *Fordham University*, 193 N. L. R. B. 134, 135 (1971). The Board later acknowledged that "a genuine system of collegiality would tend to confound us," but held that the modern university departs from that system because "ultimate authority" is vested in a board of trustees which neither attempts to convert the faculty into managerial entities nor advises them to advocate management interests. *Adelphi University*, 195 N. L. R. B. 639, 648 (1972). See *Fairleigh Dickinson University*, 227 N. L. R. B. 239, 241 (1976).

then quickly transformed them into a litany to be repeated in case after case: (i) faculty authority is collective, (ii) it is exercised in the faculty's own interest rather than in the interest of the university, and (iii) final authority rests with the board of trustees. *Northeastern University,* 218 N. L. R. B. 247, 250 (1975); *University of Miami,* 213 N. L. R. B. 634, 634 (1974); see *Tusculum College,* 199 N. L. R. B. 28, 30 (1972).[19] In their arguments in this case, the Board's lawyers have abandoned the first and third branches of this analysis,[20] which in any event were flatly inconsistent with its precedents,[21] and have transformed the second into a theory that does not appear clearly in any Board opinion.[22]

---

[19] Citing these three factors, the Board concludes in each case that faculty are professional employees. It has never explained the reasoning connecting the premise with the conclusion, although an argument similar to that made by its lawyers in this case appears in one concurring opinion. *Northeastern University,* 218 N. L. R. B., at 257 (opinion of Member Kennedy).

[20] Although the Board has preserved the points in footnotes to its brief, it no longer contends that "collective authority" and "lack of ultimate authority" are legal rationales. They are now said to be facts which, respectively, "fortif[y]" the Board's view that faculty members act in their own interest, and contradict the premise that the university is a "self-governing communit[y] of scholars." Reply Brief for Petitioner in No. 78–857, p. 11, n. 8. Cf. n. 8, *supra.*

[21] The "collective authority" branch has never been applied to supervisors who work through committees. *E. g., Florida Southern College,* 196 N. L. R. B. 888, 889 (1972). Nor was it thought to bar managerial status for employees who owned enough stock to give them, as a group, a substantial voice in the employer's affairs. See *Sida of Hawaii, Inc.,* 191 N. L. R. B. 194, 195 (1971); *Red and White Airway Cab Co.,* 123 N. L. R. B. 83, 85 (1959); *Brookings Plywood Corp.,* 98 N. L. R. B. 794, 798–799 (1952). Ultimate authority, the third branch, has never been thought to be a prerequisite to supervisory or managerial status. Indeed, it could not be since every corporation vests that power in its board of directors.

[22] We do not, of course, substitute counsel's *post hoc* rationale for the reasoning supplied by the Board itself. *SEC* v. *Chenery Corp.,* 332 U. S. 194, 196 (1947). Because the first and third branches of the Board's

## V

The controlling consideration in this case is that the faculty of Yeshiva University exercise authority which in any other context unquestionably would be managerial. Their authority in academic matters is absolute. They decide what courses will be offered, when they will be scheduled, and to whom they will be taught. They debate and determine teaching methods, grading policies, and matriculation standards. They effectively decide which students will be admitted, retained, and graduated. On occasion their views have determined the size of the student body, the tuition to be charged, and the location of a school. When one considers the function of a university, it is difficult to imagine decisions more managerial than these. To the extent the industrial analogy applies, the faculty determines within each school the product to be produced, the terms upon which it will be offered, and the customers who will be served.[23]

The Board nevertheless insists that these decisions are not managerial because they require the exercise of independent professional judgment. We are not persuaded by this argument. There may be some tension between the Act's exclusion of managerial employees and its inclusion of professionals, since most professionals in managerial positions continue to draw on their special skills and training. But we have been directed to no authority suggesting that that tension can be resolved by reference to the "independent professional judgment" cri-

---

analysis are insupportable, the Board's only colorable theory is the "interest of the employer" branch. The argument presented to us is an expanded and considerably refined version of that notion.

[23] The record shows that faculty members at Yeshiva also play a predominant role in faculty hiring, tenure, sabbaticals, termination and promotion. See *supra*, at 677, and n. 5. These decisions clearly have both managerial and supervisory characteristics. Since we do not reach the question of supervisory status, we need not rely primarily on these features of faculty authority.

terion proposed in this case.[24] Outside the university context, the Board routinely has applied the managerial and supervisory exclusions to professionals in executive positions without inquiring whether their decisions were based on management policy rather than professional expertise.[25] Indeed, the Board has twice implicitly rejected the contention that decisions based on professional judgment cannot be managerial.[26] Since the Board does not suggest that the "independent professional judgment" test is to be limited to university faculty, its new approach would overrule *sub silentio* this body of Board precedent and could result in the indiscriminate recharacterization as covered employees of professionals working in supervisory and managerial capacities.

Moreover, the Board's approach would undermine the goal it purports to serve: To ensure that employees who exercise discretionary authority on behalf of the employer will not

---

[24] The Board has cited no case directly applying an "independent professional judgment" standard. On the related question of accountability for implementation of management policies, it cites only *NLRB* v. *Fullerton Publishing Co.*, 283 F. 2d 545, 550 (CA9 1960), which held that a news editor "responsibly directed" his department so as to fall within the definition of a supervisor, 29 U. S. C. § 152 (11). The court looked in part to accountability in rejecting the claim that the editor merely relayed assignments and thus was not "responsible" for directing employees as required by the statute. The case did not involve the managerial exclusion and has no application to the issues before us.

[25] See cases cited in nn. 13 and 14, *supra*. A strict "conformity to management policy" test ignores the dual nature of the managerial role, since managers by definition not only conform to established policies but also exercise their own judgment within the range of those policies. See *Bell Aerospace*, 219 N. L. R. B., at 385 (quoting *Eastern Camera & Photo Corp.*, 140 N. L. R. B. 569, 571 (1963)).

[26] *University of Chicago Library*, 205 N. L. R. B. 220, 221–222, 229 (1973), enf'd, 506 F. 2d 1402 (CA7 1974) (reversing an Administrative Law Judge's decision which had been premised on the "professional judgment" rationale); *Sutter Community Hospitals of Sacramento*, 227 N. L. R. B., at 193 (excluding as managerial a clinical specialist who used interdisciplinary professional skills to run a hospital department).

divide their loyalty between employer and union. In arguing
that a faculty member exercising independent judgment acts
primarily in his own interest and therefore does not represent
the interest of his employer, the Board assumes that the pro-
fessional interests of the faculty and the interests of the insti-
tution are distinct, separable entities with which a faculty
member could not simultaneously be aligned. The Court of
Appeals found no justification for this distinction, and we per-
ceive none. In fact, the faculty's professional interests—as
applied to governance at a university like Yeshiva—cannot be
separated from those of the institution.

In such a university, the predominant policy normally is
to operate a quality institution of higher learning that will
accomplish broadly defined educational goals within the limits
of its financial resources. The "business" of a university is
education, and its vitality ultimately must depend on aca-
demic policies that largely are formulated and generally are
implemented by faculty governance decisions. See K. Mor-
timer & T. McConnell, Sharing Authority Effectively 23–24
(1978). Faculty members enhance their own standing and
fulfill their professional mission by ensuring that the univer-
sity's objectives are met. But there can be no doubt that
the quest for academic excellence and institutional distinction
is a "policy" to which the administration expects the faculty
to adhere, whether it be defined as a professional or an institu-
tional goal. It is fruitless to ask whether an employee is
"expected to conform" to one goal or another when the two
are essentially the same.[27]  See *NLRB* v. *Scott Paper Co.,*

[27] At Yeshiva, administrative concerns with scarce resources and Uni-
versity-wide balance have led to occasional vetoes of faculty action. But
such infrequent administrative reversals in no way detract from the insti-
tution's primary concern with the academic responsibilities entrusted to
the faculty. The suggestion that faculty interests depart from those
of the institution with respect to salary and benefits is even less meritorious.
The same is true of every supervisory or managerial employee. Indeed,
there is arguably a greater community of interest on this point in the

440 F. 2d 625, 630 (CA1 1971) (tractor owner-operators); *Deaton Truck Line, Inc.* v. *NLRB,* 337 F. 2d 697, 699 (CA5 1964) (same), cert. denied, 381 U. S. 903 (1965).

The problem of divided loyalty is particularly acute for a university like Yeshiva, which depends on the professional judgment of its faculty to formulate and apply crucial policies constrained only by necessarily general institutional goals. The university requires faculty participation in governance because professional expertise is indispensable to the formulation and implementation of academic policy.[28]  It may appear, as the Board contends, that the professor performing governance functions is less "accountable" for departures from institutional policy than a middle-level industrial manager whose discretion is more confined.  Moreover, traditional systems of collegiality and tenure insulate the professor from some of the sanctions applied to an industrial manager who fails to adhere to company policy.  But the analogy of the university to industry need not, and indeed cannot, be complete.  It is clear that Yeshiva and like universities must rely on their faculties to participate in the making and implementation of their policies.[29]  The large measure of independ-

---

university than in industry, because the nature and quality of a university depend so heavily on the faculty attracted to the institution.  B. Richman & R. Farmer, Leadership, Goals, and Power in Higher Education 258 (1974); see D. Bornheimer, G. Burns, & G. Dumke, The Faculty in Higher Education 174–175 (1973).

[28] See American Association for Higher Education, Faculty Participation in Academic Governance 22–24 (1967); Bornheimer, Burns, & Dumke, *supra,* at 149–150; Kadish, The Theory of the Profession and Its Predicament, 58 A. A. U. P. Bull. 120, 121 (1972).  The extent to which Yeshiva faculty recommendations are implemented is no "mere coincidence," as Mr. Justice Brennan's dissent suggests.  *Post,* at 701.  Rather this is an inevitable characteristic of the governance structure adopted by universities like Yeshiva.

[29] The dissent concludes, citing several secondary authorities, that the modern university has undergone changes that have shifted "the task of operating the university enterprise" from faculty to administration.  *Post,* at 703.  The shift, if it exists, is neither universal nor complete.  See

ence enjoyed by faculty members can only increase the danger that divided loyalty will lead to those harms that the Board traditionally has sought to prevent.

We certainly are not suggesting an application of the managerial exclusion that would sweep all professionals outside the Act in derogation of Congress' expressed intent to protect them. The Board has recognized that employees whose decisionmaking is limited to the routine discharge of professional duties in projects to which they have been assigned cannot be excluded from coverage even if union membership arguably may involve some divided loyalty.[30] Only if an employee's activities fall outside the scope of the duties routinely performed by similarly situated professionals will he be found aligned with management. We think these decisions accurately capture the intent of Congress, and that they provide an appropriate starting point for analysis in cases involving professionals alleged to be managerial.[31]

---

K. Mortimer & T. McConnell, Sharing Authority Effectively 27–28, 158–162, 164–165 (1978). In any event, our decision must be based on the record before us. Nor can we decide this case by weighing the probable benefits and burdens of faculty collective bargaining. See *post*, at 702–705. That, after all, is a matter for Congress, not this Court.

[30] For this reason, architects and engineers functioning as project captains for work performed by teams of professionals are deemed employees despite substantial planning responsibility and authority to direct and evaluate team members. See *General Dynamics Corp.*, 213 N. L. R. B., at 857–858; *Wurster, Bernardi & Emmons, Inc.*, 192 N. L. R. B. 1049, 1051 (1971); *Skidmore, Owings & Merrill*, 192 N. L. R. B. 920, 921 (1971). See also *Doctors' Hospital of Modesto, Inc.*, 183 N. L. R. B. 950, 951–952 (1970), enf'd, 489 F. 2d 772 (CA9 1973) (nurses); *National Broadcasting Co.*, 160 N. L. R. B. 1440, 1441 (1966) (broadcast newswriters). In the health-care context, the Board asks in each case whether the decisions alleged to be managerial or supervisory are "incidental to" or "in addition to" the treatment of patients, a test Congress expressly approved in 1974. S. Rep. No. 93–766, p. 6 (1974).

[31] We recognize that this is a starting point only, and that other factors not present here may enter into the analysis in other contexts. It is plain, for example, that professors may not be excluded merely because they

## VI

Finally, the Board contends that the deference due its expertise in these matters requires us to reverse the decision of the Court of Appeals. The question we decide today is a mixed one of fact and law. But the Board's opinion may be searched in vain for relevant findings of fact. The absence of factual analysis apparently reflects the Board's view that the managerial status of particular faculties may be decided on the basis of conclusory rationales rather than examination of the facts of each case. The Court of Appeals took a different view, and determined that the faculty of Yeshiva University, "in effect, substantially and pervasively operat[e] the enterprise." 582 F. 2d, at 698. We find no reason to reject this conclusion. As our decisions consistently show, we accord great respect to the expertise of the Board when its conclusions are rationally based on articulated facts and consistent with the Act. *Beth Israel Hospital* v. *NLRB*, 437 U. S. 483, 501 (1978). In this case, we hold that the Board's decision satisfies neither criterion.

*Affirmed.*

MR. JUSTICE BRENNAN, with whom MR. JUSTICE WHITE, MR. JUSTICE MARSHALL, and MR. JUSTICE BLACKMUN join, dissenting.

In holding that the full-time faculty members of Yeshiva University are not covered employees under the National Labor Relations Act, but instead fall within the exclusion for

---

determine the content of their own courses, evaluate their own students, and supervise their own research. There thus may be institutions of higher learning unlike Yeshiva where the faculty are entirely or predominantly nonmanagerial. There also may be faculty members at Yeshiva and like universities who properly could be included in a bargaining unit. It may be that a rational line could be drawn between tenured and untenured faculty members, depending upon how a faculty is structured and operates. But we express no opinion on these questions, for it is clear that the unit approved by the Board was far too broad.

supervisors and managerial employees, the Court disagrees with the determination of the National Labor Relations Board. Because I believe that the Board's decision was neither irrational nor inconsistent with the Act, I respectfully dissent.

I

Ten years ago the Board first asserted jurisdiction over private nonprofit institutions of higher education. *Cornell University,* 183 N. L. R. B. 329 (1970). Since then, the Board has often struggled with the Procrustean task of attempting to implement in the altogether different environment of the academic community the broad directives of a statutory scheme designed for the bureaucratic industrial workplace. See, *e. g., Adelphi University,* 195 N. L. R. B. 639, 648 (1972). Resolution of the particular issue presented in this case—whether full-time faculty members are covered "employees" under the Act—is but one of several challenges confronting the Board in this "unchartered area." *C. W. Post Center,* 189 N. L. R. B. 904, 905 (1971).

Because at the time of the Act's passage Congress did not contemplate its application to private universities, it is not surprising that the terms of the Act itself provide no answer to the question before us. Indeed, the statute evidences significant tension as to congressional intent in this respect by its explicit inclusion, on the one hand, of "professional employees" under § 2 (12), 29 U. S. C. § 152 (12), and its exclusion, on the other, of "supervisors" under § 2 (11), 29 U. S. C. § 152 (11). Similarly, when transplanted to the academic arena, the Act's extension of coverage to professionals under § 2 (12) cannot easily be squared with the Board-created exclusion of "managerial employees" in the industrial context. See generally *NLRB* v. *Bell Aerospace Co.,* 416 U. S. 267 (1974).

Primary authority to resolve these conflicts and to adapt the Act to the changing patterns of industrial relations was

entrusted to the Board, not to the judiciary. *NLRB* v. *Weingarten, Inc.*, 420 U. S. 251, 266 (1975). The Court has often admonished that "[t]he ultimate problem is the balancing of the conflicting legitimate interests. The function of striking that balance to effectuate national labor policy is often a difficult and delicate responsibility, which the Congress committed primarily to the National Labor Relations Board, subject to limited judicial review." *NLRB* v. *Truck Drivers*, 353 U. S. 87, 96 (1957). Accord, *Beth Israel Hospital* v. *NLRB*, 437 U. S. 483, 501 (1978); *NLRB* v. *Erie Resistor Corp.*, 373 U. S. 221, 235–236 (1963). Through its cumulative experience in dealing with labor-management relations in a variety of industrial and nonindustrial settings, it is the Board that has developed the expertise to determine whether coverage of a particular category of employees would further the objectives of the Act.[1] And through its continuous oversight of industrial conditions, it is the Board that is best able to formulate and adjust national labor policy to conform to the realities of industrial life. Accordingly, the judicial role is limited; a court may not substitute its own judgment for that of the Board. The Board's decision may be reviewed for its rationality and its consistency with the

---

[1] "It is not necessary in this case to make a completely definitive limitation around the term 'employee.' That task has been assigned primarily to the agency created by Congress to administer the Act. Determination of 'where all the conditions of the relation require protection' involves inquiries for the Board charged with this duty. Everyday experience in the administration of the statute gives it familiarity with the circumstances and backgrounds of employment relationships in various industries, with the abilities and needs of the workers for self-organization and collective action, and with the adaptability of collective bargaining for the peaceful settlement of their disputes with their employers. The experience thus acquired must be brought frequently to bear on the question who is an employee under the Act. Resolving that question . . . 'belongs to the usual administrative routine' of the Board." *NLRB* v. *Hearst Publications, Inc.*, 322 U. S. 111, 130 (1944). Accord, *NLRB* v. *Seven-Up Bottling Co.*, 344 U. S. 344, 349 (1953).

Act, but once these criteria are satisfied, the order must be enforced. See *Beth Israel Hospital* v. *NLRB, supra,* at 501.

## II

In any event, I believe the Board reached the correct result in determining that Yeshiva's full-time faculty is covered under the NLRA. The Court does not dispute that the faculty members are "professional employees" for the purposes of collective bargaining under § 2 (12), but nevertheless finds them excluded from coverage under the implied exclusion for "managerial employees." [2] The Court explains that "[t]he controlling consideration in this case is that the faculty of Yeshiva University exercise authority which in any other context unquestionably would be managerial." *Ante,* at 686. But the academic community is simply not "any other context." The Court purports to recognize that there are fundamental differences between the authority structures of the typical industrial and academic institutions which preclude the blind transplanting of principles developed in one arena onto the other; yet it nevertheless ignores those very differences in concluding that Yeshiva's faculty is excluded from the Act's coverage.

As reflected in the legislative history of the Taft-Hartley Amendments of 1947, the concern behind the exclusion of supervisors under § 2 (11) of the Act is twofold. On the one hand, Congress sought to protect the rank-and-file employees from being unduly influenced in their selection of leaders by the presence of management representatives in their union. "If supervisors were members of and active in the union which represented the employees they supervised it could be pos-

---

[2] Because the Court concludes that Yeshiva's full-time faculty are managerial employees, it finds it unnecessary to reach the University's contention that the faculty are also excluded as "supervisors" under § 2 (11). *Ante,* at 682. My discussion therefore focuses on the question of the faculty's managerial status, but I would resolve the issue of their supervisory status in a similar fashion.

sible for the supervisors to obtain and retain positions of power in the union by reason of their authority over their fellow union members while working on the job." *NLRB* v. *Metropolitan Life Ins. Co.,* 405 F. 2d 1169, 1178 (CA2 1968). In addition, Congress wanted to ensure that employers would not be deprived of the undivided loyalty of their supervisory foremen. Congress was concerned that if supervisors were allowed to affiliate with labor organizations that represented the rank and file, they might become accountable to the workers, thus interfering with the supervisors' ability to discipline and control the employees in the interest of the employer.[3]

Identical considerations underlie the exclusion of managerial employees. See *ante,* at 682. Although a variety of verbal formulations have received judicial approval over the years, see *Retail Clerks International Assn.* v. *NLRB,* 125 U. S. App. D. C. 63, 65–66, 366 F. 2d 642, 644–645 (1966), this Court has recently sanctioned a definition of "managerial employee" that comprises those who " 'formulate and effectuate management policies by expressing and making operative the decisions of their employer.' " See *NLRB* v. *Bell Aerospace Co.,* 416 U. S., at 288. The touchstone of managerial status is thus an alliance with management, and the pivotal inquiry is whether the employee in performing his

---

[3] See H. R. Rep. No. 245, 80th Cong., 1st Sess., 14 (1947):

"The evidence before the committee shows clearly that unionizing supervisors under the Labor Act is inconsistent with the purpose of the act . . . . It is inconsistent with the policy of Congress to assure to workers freedom from domination or control by their supervisors in their organizing and bargaining activities. It is inconsistent with our policy to protect the rights of employers; they, as well as workers, are entitled to loyal representatives in the plants, but when the foremen unionize, even in a union that claims to be 'independent' of the union of the rank and file, they are subject to influence and control by the rank and file union, and, instead of their bossing the rank and file, the rank and file bosses them."

See also S. Rep. No. 105, 80th Cong., 1st Sess., 3–5 (1947).

duties represents his own interests or those of his employer.[4] If his actions are undertaken for the purpose of implementing the employer's policies, then he is accountable to management and may be subject to conflicting loyalties. But if the employee is acting only on his own behalf and in his own interest, he is covered under the Act and is entitled to the benefits of collective bargaining.

After examining the voluminous record in this case,[5] the Board determined that the faculty at Yeshiva exercised its decisionmaking authority in its own interest rather than "in the interest of the employer." 221 N. L. R. B. 1053, 1054 (1975). The Court, in contrast, can perceive "no justification for this distinction" and concludes that the faculty's interests "cannot be separated from those of the institution." *Ante*, at 688.[6] But the Court's vision is clouded by its failure fully to discern and comprehend the nature of the faculty's role in university governance.

Unlike the purely hierarchical decisionmaking structure that prevails in the typical industrial organization, the bureaucratic foundation of most "mature" universities is characterized by dual authority systems. The primary decisional

---

[4] Section 2 (11) of the Act requires, as a condition of supervisory status, that authority be exercised "in the interest of the employer." 29 U. S. C. § 152 (11). See also *NLRB* v. *Master Stevedores Assn.*, 418 F. 2d 140 (CA5 1969); *International Union of United Brewery Workers* v. *NLRB*, 111 U. S. App. D. C. 383, 298 F. 2d 297 (1961).

[5] The Board held hearings over a 5-month period and compiled a record containing more than 4,600 pages of testimony and 200 exhibits.

[6] The Court thus determines that all of Yeshiva's full-time faculty members are managerial employees, even though their role in university decisionmaking is limited to the professional recommendations of the faculty acting as a collective body, and even though they supervise and manage no personnel other than themselves. The anomaly of such a result demonstrates the error in extending the managerial exclusion to a class of essentially rank-and-file employees who do not represent the interests of management and who are not subject to the danger of conflicting loyalties which motivated the adoption of that exemption.

network is hierarchical in nature: Authority is lodged in the administration, and a formal chain of command runs from a lay governing board down through university officers to individual faculty members and students. At the same time, there exists a parallel professional network, in which formal mechanisms have been created to bring the expertise of the faculty into the decisionmaking process. See J. Baldridge, Power and Conflict in the University 114 (1971); Finkin, The NLRB in Higher Education, 5 U. Toledo L. Rev. 608, 614–618 (1974).

What the Board realized—and what the Court fails to apprehend—is that whatever influence the faculty wields in university decisionmaking is attributable solely to its collective expertise as professional educators, and not to any managerial or supervisory prerogatives. Although the administration may look to the faculty for advice on matters of professional and academic concern, the faculty offers its recommendations in order to serve its own independent interest in creating the most effective environment for learning, teaching, and scholarship.[7] And while the administration may attempt to defer to the faculty's competence whenever possible, it must and does apply its own distinct perspective to those recommendations, a perspective that is based on fiscal

---

[7] As the Board has recognized, due to the unique nature of their work, professional employees will often make recommendations on matters that are of great importance to management. But their desire to exert influence in these areas stems from the need to maintain their own professional standards, and this factor—common to all professionals—should not, by itself, preclude their inclusion in a bargaining unit. See *Westinghouse Electric Corp.*, 113 N. L. R. B. 337, 339–340 (1955). In fact, Congress clearly recognized both that professional employees consistently exercise independent judgment and discretion in the performance of their duties, see 29 U. S. C. § 152 (12), and that they have a significant interest in maintaining certain professional standards, see S. Rep. No. 105, 80th Cong., 1st Sess., 11 (1947). Yet Congress specifically included professionals within the Act's coverage. See *NLRB* v. *Bell Aerospace Co.*, 416 U. S. 267, 298 (1974) (WHITE, J., dissenting in part).

and other managerial policies which the faculty has no part in developing. The University always retains the ultimate decisionmaking authority, see *ante,* at 675–676, and the administration gives what weight and import to the faculty's collective judgment as it chooses and deems consistent with its own perception of the institution's needs and objectives.[8]

The premise of a finding of managerial status is a determination that the excluded employee is acting on behalf of management and is answerable to a higher authority in the exercise of his responsibilities. The Board has consistently implemented this requirement—both for professional and non-professional employees—by conferring managerial status only upon those employees "whose interests are closely aligned with management *as true representatives of management.*" (Emphasis added.) *E. g., Sutter Community Hospitals of Sacramento,* 227 N. L. R. B. 181, 193 (1976); *Bell Aero-*

---

[8] One must be careful not to overvalue the significance of the faculty's influence on academic affairs. As one commentator has noted, "it is not extraordinary for employees to seek to exert influence over matters embedded in an employment relationship for which they share a concern, or that management would be responsive to their strongly held desires." Finkin, The NLRB in Higher Education, 5 U. Toledo L. Rev. 608, 616 (1974). Who, after all, is better suited than the faculty to decide what courses should be offered, how they should be taught, and by what standards their students should be graded? Employers will often attempt to defer to their employees' suggestions, particularly where—as here—those recommendations relate to matters within the unique competence of the employees.

Moreover, insofar as faculty members are given some say in more traditional managerial decisions such as the hiring and promotion of other personnel, such discretion does not constitute an adequate basis for the conferral of managerial or supervisory status. Indeed, in the typical industrial context, it is not uncommon for the employees' union to be given the *exclusive* right to recommend personnel to the employer, and these hiring-hall agreements have been upheld even where the union requires a worker to pass a union-administered skills test as a condition of referral. See, *e. g., Local 42 (Catalytic Constr. Co.),* 164 N. L. R. B. 916 (1967); see generally *Teamsters* v. *NLRB,* 365 U. S. 667 (1961).

*space,* 219 N. L. R. B. 384, 385 (1975); *General Dynamics Corp.,* 213 N. L. R. B. 851, 857 (1974).[9] Only if the employee is expected to conform to management policies and is judged by his effectiveness in executing those policies does the danger of divided loyalties exist.

Yeshiva's faculty, however, is not accountable to the administration in its governance function, nor is any individual faculty member subject to personal sanction or control based on the administration's assessment of the worth of his recommendations. When the faculty, through the schools' advisory committees, participates in university decisionmaking on subjects of academic policy, it does not serve as the "representative of management." [10] Unlike industrial supervisors

---

[9] The Board has also explained that the ability of the typical professional employee to influence company policy does not bestow managerial authority:

"Work which is based on professional competence necessarily involves a consistent exercise of discretion and judgment, else professionalism would not be involved. Nevertheless, professional employees plainly are not the same as management employees either by definition or in authority, and managerial authority is not vested in professional employees merely by virtue of their professional status, or because work performed in that status may have a bearing on company direction." *General Dynamics Corp.,* 213 N. L. R. B., at 857–858.

[10] Where faculty members actually do serve as management's representatives, the Board has not hesitated to exclude them from the Act's coverage as managerial or supervisory personnel. Compare *University of Vermont,* 223 N. L. R. B. 423 (1976) (excluding department chairmen as supervisors), and *University of Miami,* 213 N. L. R. B. 634 (1974) (excluding deans as supervisors), with *Northeastern University,* 218 N. L. R. B. 247 (1975) (department chairmen included within bargaining unit because they act primarily as instruments of the faculty), and *Fordham University,* 193 N. L. R. B. 134 (1971) (including department chairmen because they are considered to be representatives of the faculty rather than of the administration). In fact, the bargaining unit approved by the Board in the present case excluded deans, acting deans, directors, and principal investigators of research and training grants, all of whom were deemed to exercise supervisory or managerial authority. See *ante,* at 678, n. 7.

and managers, university professors are not hired to "make operative" the policies and decisions of their employer. Nor are they retained on the condition that their interests will correspond to those of the university administration. Indeed, the notion that a faculty member's professional competence could depend on his undivided loyalty to management is antithetical to the whole concept of academic freedom. Faculty members are judged by their employer on the quality of their teaching and scholarship, not on the compatibility of their advice with administration policy. Board Member Kennedy aptly concluded in his concurring opinion in *Northeastern University*, 218 N. L. R. B. 247, 257 (1975) (footnote omitted):

> "[T]he influence which the faculty exercises in many areas of academic governance is insufficient to make them 'managerial' employees. Such influence is not exercised 'for management' or 'in the interest of the employer,' but rather is exercised in their own professional interest. The best evidence of this fact is that faculty members are generally not held accountable by or to the administration for their faculty governance functions. Faculty criticism of administration policies, for example, is viewed not as a breach of loyalty, but as an exercise in academic freedom. So, too, intervention by the university administration in faculty deliberations would most likely be considered an infringement upon academic freedoms. Conversely, university administrations rarely consider themselves bound by faculty recommendations."

It is no answer to say, as does the Court, that Yeshiva's faculty and administration are one and the same because their interests tend to coincide. In the first place, the National Labor Relations Act does not condition its coverage on an antagonism of interests between the employer and the em-

ployee.[11]   The mere coincidence of interests on many issues
has never been thought to abrogate the right to collective
bargaining on those topics as to which that coincidence is
absent.   Ultimately, the performance of an employee's duties
will always further the interests of the employer, for in no
institution do the interests of labor and management totally
diverge.   Both desire to maintain stable and profitable op-
erations, and both are committed to creating the best possible
product within existing financial constraints.   Differences of
opinion and emphasis may develop, however, on exactly how
to devote the institution's resources to achieve those goals.
When these disagreements surface, the national labor laws
contemplate their resolution through the peaceful process of
collective bargaining.   And in this regard, Yeshiva University
stands on the same footing as any other employer.

Moreover, the congruence of interests in this case ought
not to be exaggerated.   The university administration has
certain economic and fiduciary responsibilities that are not
shared by the faculty, whose primary concerns are academic
and relate solely to its own professional reputation.   The
record evinces numerous instances in which the faculty's
recommendations have been rejected by the administration
on account of fiscal constraints or other managerial policies.
Disputes have arisen between Yeshiva's faculty and admin-
istration on such fundamental issues as the hiring, tenure,
promotion, retirement, and dismissal of faculty members,

---

[11] Nor does the frequency with which an employer acquiesces in the
recommendations of its employees convert them into managers or super-
visors.  See *Stop & Shop Cos., Inc.* v. *NLRB*, 548 F. 2d 17, 19 (CA1
1977).   Rather, the pertinent inquiries are who retains the ultimate
decisionmaking authority and in whose interest the suggestions are offered.
A different test could permit an employer to deny its employees the bene-
fits of collective bargaining on important issues of wages, hours, and other
conditions of employment merely by consulting with them on a host of
less significant matters and accepting their advice when it is consistent
with management's own objectives.

academic standards and credits, departmental budgets, and even the faculty's choice of its own departmental represent-ative.[12] The very fact that Yeshiva's faculty has voted for the Union to serve as its representative in future negotiations with the administration indicates that the faculty does not perceive its interests to be aligned with those of management. Indeed, on the precise topics which are specified as mandatory subjects of collective bargaining—wages, hours, and other terms and conditions of employment[13]—the interests of teacher and administrator are often diametrically opposed.

Finally, the Court's perception of the Yeshiva faculty's status is distorted by the rose-colored lens through which it views the governance structure of the modern-day university. The Court's conclusion that the faculty's professional inter- ests are indistinguishable from those of the administration is bottomed on an idealized model of collegial decisionmaking that is a vestige of the great medieval university. But the university of today bears little resemblance to the "com- munity of scholars" of yesteryear.[14] Education has become

---

[12] See, e. g., App. 740–742 (faculty hiring); id., at 232–233, 632, 667 (tenure); id., at 194, 620, 742–743 (promotion); id., at 713, 1463–1464 (retirement); id., at 241 (dismissal); id., at 362 (academic credits); id., at 723–724, 1469–1470 (cutback in departmental budget leading to loss of accreditation); id., at 410, 726–727 (election of department chairman and representative).

[13] See 29 U. S. C. § 158 (d).

[14] See generally J. Brubacher & W. Rudy, Higher Education in Tran- sition: A History of American Colleges and Universities, 1636–1976 (3d ed. 1976). In one of its earliest decisions in this area, the Board recognized that the governance structure of the typical modern university does not fit the mold of true collegiality in which authority rests with a peer group of scholars. Adelphi University, 195 N. L. R. B. 639, 648 (1972). Accord, New York University, 205 N. L. R. B. 4, 5 (1973). Even the concept of "shared authority," in which university decisionmaking is seen as the joint responsibility of both faculty and administration, with each exerting a dominant influence in its respective sphere of expertise, has

"big business," and the task of operating the university enterprise has been transferred from the faculty to an autonomous administration, which faces the same pressures to cut costs and increase efficiencies that confront any large industrial organization.[15]    The past decade of budgetary cutbacks, declining enrollments, reductions in faculty appointments, curtailment of academic programs, and increasing calls for accountability to alumni and other special interest groups has only added to the erosion of the faculty's role in the institution's decisionmaking process.[16]

---

been found to be "an ideal rather than a widely adopted practice." K. Mortimer & T. McConnell, Sharing Authority Effectively 4 (1978). The authors conclude:

"Higher education is in the throes of a shift from informal and consensual judgments to authority based on formal criteria. . . .   There have been changes in societal and legislative expectations about higher education, an increase in external regulation of colleges and universities, an increase in emphasis on managerial skills and the technocratic features of modern management, and a greater codification of internal decision-making procedures.   These changes raise the question whether existing statements of shared authority provide adequate guidelines for internal governance." *Id.*, at 269.

[15] In 1976–1977, the total expenditures of institutions of higher education in the United States exceeded $42 billion.   National Center for Education Statistics, Digest of Education Statistics 137 (Table 133) (1979).   In the same year, Yeshiva University, a private institution, received over $34 million in revenues from the Federal Government.   *Id.*, at 132 (Table 127).

[16] University faculty members have been particularly hard hit by the current financial squeeze.   Because of inflation, the purchasing power of the faculty's salary has declined an average of 2.9% every year since 1972.   Real salaries are thus 13.6% below the 1972 levels.   Hansen, An Era of Continuing Decline: Annual Report on the Economic Status of the Profession, 1978–1979, 65 Academe: Bulletin of the American Association of University Professors 319, 323–324 (1979).   Moreover, the faculty at Yeshiva has fared even worse than most.   Whereas the average salary of a full professor at a comparable institution is $31,100, a full professor at Yeshiva averages only $27,100.   *Id.*, at 334, 348.   In fact, a severe financial crisis at the University in 1971–1972 forced the president to order a freeze on all faculty promotions and pay increases.   App. 1459.

These economic exigencies have also exacerbated the tensions in university labor relations, as the faculty and administration more and more frequently find themselves advocating conflicting positions not only on issues of compensation, job security, and working conditions, but even on subjects formerly thought to be the faculty's prerogative. In response to this friction, and in an attempt to avoid the strikes and work stoppages that have disrupted several major universities in recent years, many faculties have entered into collective-bargaining relationships with their administrations and governing boards.[17] An even greater number of schools—Yeshiva among them—have endeavored to negotiate and compromise their differences informally, by establishing avenues for faculty input into university decisions on matters of professional concern.

---

[17] As of January 1979, 80 private and 302 public institutions of higher education had engaged in collective bargaining with their faculties, and over 130,000 academic personnel had been unionized. National Center for the Study of Collective Bargaining in Higher Education, Directory of Faculty Contracts and Bargaining Agents in Institutions of Higher Education i–ii (1979). Although the NLRA is not applicable to any public employer, see 29 U. S. C. § 152 (2), as of 1976, 22 States had enacted legislation granting faculties at public institutions the right to unionize and requiring public employers to bargain with duly constituted bargaining agents. Mortimer & McConnell, *supra* n. 14, at 53. See also Livingston & Christensen, State and Federal Regulation of Collective Negotiations in Higher Education, 1971 Wis. L. Rev. 91, 102.

The upsurge in the incidence of collective bargaining has generally been attributed to the faculty's desire to use the process as a countervailing force against increased administrative power and to ensure that the ideals of the academic community are actually practiced. As the Carnegie Commission found, "[u]nionization for [faculty] is more a protective than an aggressive act, more an effort to preserve the status quo than to achieve a new position of influence and affluence. . . ." Carnegie Commission on Higher Education, Governance of Higher Education 40 (1973). See also Mortimer & McConnell, *supra* n. 14, at 56; Lindeman, The Five Most Cited Reasons for Faculty Unionization, 102 Intellect 85 (1973); Nielsen & Polishook, Collective Bargaining and Beyond, The Chronicle of Higher Education 7 (May 21, 1979).

Today's decision, however, threatens to eliminate much of the administration's incentive to resolve its disputes with the faculty through open discussion and mutual agreement. By its overbroad and unwarranted interpretation of the managerial exclusion, the Court denies the faculty the protections of the NLRA and, in so doing, removes whatever deterrent value the Act's availability may offer against unreasonable administrative conduct.[18] Rather than promoting the Act's objective of funneling dissension between employers and employees into collective bargaining, the Court's decision undermines that goal and contributes to the possibility that "recurring disputes [will] fester outside the negotiation process until strikes or other forms of economic warfare occur." *Ford Motor Co.* v. *NLRB,* 441 U. S. 488, 499 (1979).

### III

In sum, the Board analyzed both the essential purposes underlying the supervisory and managerial exclusions and the nature of the governance structure at Yeshiva University. Relying on three factors that attempt to encapsulate the fine distinction between those professional employees who are entitled to the NLRA's protections and those whose managerial responsibilities require their exclusion,[19] the Board concluded

---

[18] The Carnegie Commission, in concluding that "faculty members should have the right to organize and to bargain collectively, if they so desire," Carnegie Commission on Higher Education, *supra,* at 43, observed:

"We may be involved in a long-term period of greater social conflict in society and greater tension on campus. If so, it may be better to institutionalize this conflict through collective bargaining than to have it manifest itself with less restraint. Collective bargaining does provide agreed-upon rules of behavior, contractual understandings, and mechanisms for dispute settlement and grievance handling that help to manage conflict." *Id.,* at 51.

[19] Contrary to the Court's assertion, see *ante,* at 685, the Board has not abandoned the "collective authority" and "ultimate authority" branches of its analysis. See Reply Brief for Petitioner in No. 78–857, pp. 11–12, n. 8. Although the "interest/alignment analysis" rationale goes to the

that Yeshiva's full-time faculty qualify as the former rather than the latter. I believe the Board made the correct determination. But even were I to have reservations about the specific result reached by the Board on the facts of this case, I would certainly have to conclude that the Board applied a proper mode of analysis to arrive at a decision well within the zone of reasonableness. Accordingly, in light of the deference due the Board's determination in this complex area, I would reverse the judgment of the Court of Appeals.

---

heart of the basis for the managerial and supervisory exclusions and therefore provides the strongest support for the Board's determination, the other two rationales are significant because they highlight two aspects of the university decisionmaking process relevant to the Board's decision: That the faculty's influence is exercised collectively—and only collectively—indicates that the faculty's recommendations embody the views of the rank and file rather than those of a select group of persons charged with formulating and implementing management policies. Similarly, that the administration retains ultimate authority merely indicates that a true system of collegiality is simply not the mode of governance at Yeshiva University.