NEW YORK COUNCIL, ASSOCIATION OF CIVILIAN TECHNICIANS, Petitioner,

v.

FEDERAL LABOR RELATIONS AUTHORITY, Respondent.

State of New York, Division of Military and Naval Affairs, and United States Department of Defense, Intervenors.

No. 555, Docket 84–4128.

United States Court of Appeals, Second Circuit.

Argued Jan. 18, 1985.

Decided March 14, 1985.

Bruce E. Endy, Philadelphia, Pa. (Bernard N. Katz, Spear, Wilderman, Sigmond, Borish, Endy & Silverstein, Philadelphia, Pa., of counsel), for petitioner.

William R. Tobey, Washington, D.C. (Ruth E. Peters, Steven H. Svartz, William E. Persina, Washington, D.C., of counsel), for respondent.

Marc Richman, Washington, D.C. (Richard K. Willard, Acting Asst. Atty. Gen., William Kanter, James C. Hise, Joseph R. Reyna, Washington, D.C., of counsel), for intervenors.

H. Stephan Gordon, Washington, D.C. (Clinton D. Wolcott, Washington, D.C., of counsel), for National Federation of Federal Employees, as amicus curiae.

William J. Stone, Washington, D.C. (Charles A. Hobbie, Mark D. Roth, Washington, D.C., of counsel), for American Federation of Government Employees, AFL–CIO, as amicus curiae.

Before OAKES, CARDAMONE and PIERCE, Circuit Judges.

CARDAMONE, Circuit Judge:

Apparently giving the maxim "apparel oft proclaims the man"[1] the force of law, the Federal Labor Relations Authority has found that the New York National Guard may require its civilian technicians to be clothed in military dress. Resolution of the issue hinges on whether the technicians' attire is subject to mandatory bargaining or whether the wearing of uniforms is a "means" by which the Guard performs its mission and therefore is nonnegotiable. A previous decision of the Federal Labor Relations Authority was remanded because it had failed to address the "means" objection to negotiability. *State of New York, Division of Military and Naval Affairs v. FLRA*, 696 F.2d 202, 205 (2d Cir.1982). In

---

1. W. Shakespeare, *Hamlet*, Act I, scene iii, reprinted in *The Complete Works of William* *Shakespeare* (W. Craig ed. 1928).

its decision and order on remand, now before us on this appeal, the Authority disregarded the rule established by its predecessor that civilian attire is nonnegotiable only when it is shown that a functional relationship exists between the wearing of a uniform and the performance of the technician's duties. The Authority also disregarded the factual findings of the Federal Service Impasses Panel that the Guard had not demonstrated such a link between the "means" and the accomplishment of the Guard's mission. Nevertheless, we believe the Authority has given a reasoned explanation for its decision that does not contravene Congressional purpose. In this regard, it must be emphasized that the Authority was intended to take an independent approach to federal labor relations and was not to be bound—or even necessarily influenced—by its predecessor, the Federal Labor Relations Council. Hence, we deny the petition for review.

## I

### Factual Background

The New York Council, Association of Civilian Technicians ("Union") petitions to set aside an order of the Federal Labor Relations Authority ("FLRA" or "Authority") reported as *Division of Military and Naval Affairs, State of New York, Albany, New York,* 15 FLRA No. 65 (1984). The order and opinion dismissed a complaint brought against the Division of Military and Naval Affairs, State of New York ("New York National Guard" or "Guard") for its refusal to comply with an order of the Federal Service Impasses Panel ("FSIP" or "Panel") that required the Guard to include a collective bargaining provision permitting its civilian technicians to wear civilian attire. The Authority found the issue to be beyond the scope of required bargaining. The New York National Guard and the Department of Defense have intervened and the American Federation of Government Employees, AFL–CIO, and the National Federation of Federal Employees have filed amicus curiae briefs. We have jurisdiction pursuant to Section 701(a) of the Civil Service Reform Act of 1978, 5 U.S.C. § 7123(a) (1982). Title VII of the Civil Service Reform Act of 1978 is codified as the Federal Service Labor-Management Relations Act (Labor Management Act), 5 U.S.C. §§ 7101 *et seq.*

The Guard's mission is to provide trained personnel for mobilization in time of war, national emergency or civil disruption. The Adjutant General in each state—in New York the Chief of Staff to the Governor holds the position, but not the title—administers the hiring of civilian technicians, who are employed as aircraft mechanics, sheet metal mechanics, auto mechanics, electronic mechanics, machinists and supply technicians. They have been said to constitute the "backbone" of the Guard and are the only personnel on duty for much of the year. *Maryland v. United States,* 381 U.S. 41, 49, 85 S.Ct. 1293, 1298, 14 L.Ed.2d 205, *vacated on other grounds,* 382 U.S. 159, 86 S.Ct. 305, 15 L.Ed.2d 227 (1965). The technicians have federal civilian employee status under the National Guard Technicians Act of 1968, 32 U.S.C. § 709 (1982), and as such are assigned wage grades, receive fringe benefits, negotiate labor agreements, and may only be discharged for "cause." *See generally AFGE Local 2953 v. FLRA,* 730 F.2d 1534 (D.C.Cir.1984) (discussing status of technicians under Technicians Act). As a condition of employment, these employees must be members in the Guard and attend four training assemblies each month and a two-week encampment each year. Air National Guard technicians in New York have always worn uniforms, but prior to 1972 Army Guard technicians did not.

The Union became the certified collective bargaining representative of all Army and Air National Guard technicians employed by the New York National Guard in 1970. In 1978, the Union filed a request with the FSIP asking it to resolve a dispute between it and the Adjutant General that related in part to the question of whether civilian technicians may wear civilian clothing when performing their civilian technician duties. The reason for the request was

that National Guard Bureau regulations and the New York Adjutant General's directives required the technicians to wear uniforms even while performing civilian duties. The NGB regulation at issue reads:

> Technicians in the excepted service will wear the military uniform appropriate to their service and federally recognized grade when performing technician duties and will comply with standards of the appropriate service pertaining to grooming and wearing of the military uniform.

After a hearing, the Panel recommended that the Union and the Adjutant General adopt language in their collective bargaining agreement that would provide civilian technicians "the option of wearing either the military uniform[ ] or an agreed-upon standard civilian attire without displaying military rank." The provision was subject to agreed-upon exceptions specifying circumstances under which uniforms could be required.

When the Guard rejected the recommendation, the Panel ordered the Adjutant General to implement it. No. 78 FSIP 32. The FLRA denied the Adjutant General's petition for reconsideration of the Panel's decision. The Adjutant General nonetheless continued its refusal to comply with the Panel's order. The Union therefore filed unfair labor practice charges, alleging a violation of § 7116(a)(1) and (6) of the Labor Management Act. When the Authority's General Counsel issued a complaint, the Guard claimed that it was not obligated to bargain over the uniform issue because it was a management right under § 12(b)(5)[2] of Executive Order No. 11491, which at the time governed the labor relations of federal employees. The Authority agreed with the Administrative Law Judge

and found that the Adjutant General had committed an unfair labor practice by refusing to comply with the Panel's order. It relied on its earlier decision in *State of Nevada National Guard*, 7 FLRA No. 37 (1981), in which it had held that the FSIP order concerning the uniform issue was not contrary to the United States Constitution or the Technicians Act, and that the Guard had demonstrated no "compelling need" for requiring uniforms.

The Guard appealed and we remanded the matter to the Authority "to develop a full record appropriate for judicial review as to whether the attire the technicians should wear while engaged in their daily duties as civilians is a non-negotiable matter under Section 7106(b)" of the Labor Management Act.[3] *State of New York v. FLRA*, 696 F.2d at 205. We noted that *State of Nevada National Guard* had not addressed the issue, and that it had been properly raised in the instant proceeding. *Id.* In March 1983, the Authority issued a notice of reopened proceedings and requested the parties to submit statements on whether the uniform issue was nonnegotiable under § 7106(b)(1). The Authority's General Counsel, the Union, and the Guard each submitted statements. The Guard attached affidavits of various State Adjutant Generals and requested an evidentiary hearing. The Authority denied that request. By the time the Authority requested these position statements, 60 Army and Air National Guard units had collectively bargained for the right to wear civilian attire. In its decision after remand, the Authority held that the uniform requirement was negotiable only at the election of the Guard as a "methods, and means of performing work" under § 7106(b)(1) because permitting civilian attire would di-

---

2. Section 12(b)(5) of Executive Order No. 11491 reads:

(b) management officials of the agency retain the right, in accordance with applicable laws and regulations—

....

(5) to determine the methods, means, and personnel by which such operations are to be conducted.

5 U.S.C. § 7101 note.

3. Section 7106(b)(1) provides in pertinent part that

nothing in this section shall preclude any agency and any labor organization from negotiating—

(1) at the election of the agency, on the ... methods, and means of performing.

5 U.S.C. § 7106(b)(1).

rectly interfere with the performance of the technicians' duties in furtherance of the Guard's mission. By so holding, the Authority changed the interpretation of the "methods and means" language in § 7106(b)(1) as it applies to the uniform question. The Authority's predecessor, the Federal Labor Relations Council ("FLRC" or "Council"), had required a "functional relationship" between the wearing of a uniform and accomplishment of the Guard's mission.

The Unions and amici now petition to have that the Authority's decision set aside on three grounds. They claim it was contrary to law, arbitrary and capricious, and unsupported by substantial evidence. First, they contend that the decision contravenes the clear aim of Congress that the management rights provision be a narrow exception to the duty to bargain. Second, they assert that the FLRA's decision is an unexplained departure from the precedent of its predecessor, and is therefore arbitrary and capricious.[4] Finally, they argue that the Authority failed to use the procedures required by the remand order and by the Administrative Procedure Act, failed to articulate the factual findings underlying its conclusions, and reached a conclusion that lacks the support of substantial evidence in the record. We address each contention in turn.

## II

### SCOPE OF REVIEW

Section 7123(c) of the Labor Management Act provides that decisions of the Authority are subject to judicial review in accordance with the Administrative Procedure Act. 5 U.S.C. § 7123(c). Therefore, FLRA decisions and orders that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), must be set aside. To analyze

the question requires us to engage in two distinct tasks. We must first decide whether the Authority has acted within its delegated authority—that is, whether the choice it has made was one entrusted to it by Congress. And then assuming such is the case, we must decide whether its rule is the product of reasoned decision-making. *See Office of Communication of the United Church of Christ v. FCC*, 707 F.2d 1413, 1422 (D.C.Cir.1983).

### A. Delegated Authority

 In its first consideration of an FLRA interpretation of the Civil Service Reform Act, the Supreme Court recently explained:

> Like the National Labor Relations Board, the FLRA was intended to develop specialized expertise in its field of labor relations and to use that expertise to give content to the principles and goals set forth in the Act. Consequently, the Authority is entitled to considerable deference when it exercises its "special function of applying the general provisions of the Act to the complexities" of federal labor relations.
>
> On the other hand, the "deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia which results in the unauthorized assumption by an agency of major policy decisions properly made by Congress." Accordingly, while reviewing courts should uphold reasonable and defensible constructions of an agency's enabling Act, they must not "rubber-stamp ... administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute."

*Bureau of Alcohol, Tobacco and Firearms v. FLRA*, 464 U.S. 89, 104 S.Ct. 439, 444, 78 L.Ed.2d 195 (1983) (citations omitted).

---

**4.** The National Federation of Federal Employees contends that the Authority's decision is also contrary to its own precedent, citing *State of Nevada National Guard*. But as noted in our previous decision, that case did not address the management rights issue. The finding that

there was no "compelling need" for the regulation related to a separate challenge based on the requirement that a local regulation be essential to the accomplishment of the Guard's mission before it can be found nonnegotiable. *See* 5 U.S.C. § 7117.

## B. *Reasoned Decision-Making*

■ In *Motor Vehicle Manufacturers Assoc. v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983), the Supreme Court emphasized that when an agency follows a settled course, its signals that in its view by pursuing that course it is carrying out the Congressional mandate, and that by adhering to the settled path it best carries out Congressional policy. *Id.* at 2866. Thus, when an agency reverses its course, a court must satisfy itself that the agency knows it is changing course, has given sound reasons for the change, and has shown that the rule is consistent with the law that gives the agency its authority to act. *Public Citizen v. Steed,* 733 F.2d 93, 99 (D.C.Cir.1984). In addition, the agency must consider reasonably obvious alternatives and, if it rejects those alternatives, it must give reasons for the rejection, sufficient to allow for meaningful judicial review. *Id.* Although there is not a "heightened standard of scrutiny ... *the agency must explain why the original reasons for adopting the rule or policy are no longer dispositive." Brae Corp.. v. United States,* 740 F.2d 1023, 1038 (D.C.Cir.1984) (emphasis added). Even in the absence of cumulative experience, changed circumstances or judicial criticism, an agency is free to change course after reweighing the competing statutory policies. But such a flip-flop must be accompanied by a reasoned explanation of why the new rule effectuates the statute as well as or better than the old rule. *Office of Communication of United Church of Christ v. FCC,* 560 F.2d 529, 532 (2d Cir.1977).

■ The Court explained in *State Farm* that it would not be "reasonable," nor would it demonstrate fidelity to the statutory mandate, for an agency to make a change not justified by the record. 103 S.Ct. at 2866. Although recognizing that the scope of judicial review under the arbitrary and capricious standard is narrow, a reviewing court must be certain that an agency has considered all the important aspects of the issue and articulated a "sat-isfactory explanation for its action, including a 'rational connection between the facts found and the choice made.' " *Id.* at 2866-67. An agency will have acted arbitrarily if it has: (1) relied on factors that Congress did not want it to consider; (2) failed to consider an important aspect of the problem; (3) given an explanation for its decision that is contrary to the evidence before it; or (4) given an explanation so implausible that it cannot be ascribed to any view of the facts or to agency expertise. *Id.* at 2867. With these principles of review in mind, we consider the legislative history and the Authority's decision.

### III

#### LEGISLATIVE HISTORY

■ The labor relations of federal employees are now regulated by Title VII of the Civil Service Reform Act of 1978, 5 U.S.C. §§ 7101 *et seq.,* which requires agencies to bargain with their employees over the conditions of employment, subject only to express statutory exceptions. *Library of Congress v. FLRA,* 699 F.2d 1280, 1285 (D.C.Cir.1983). This appeal involves the "management right" to avoid mandatory bargaining over the "technology, methods, and means of performing work." 5 U.S.C. § 7106(b)(1). An agency may elect to bargain over these matters, but it need not. The legislative history of the Labor Management Act makes clear that § 7106 is a narrow exception to the right to bargain over working conditions. Congress intended § 7106(a) to expand the scope of bargaining that had existed under Section 12(b)(5) of Executive Order No. 11491 and FLRC precedent. *See, e.g.,* 124 Cong.Rec. 29198 (1978) (remarks of Rep. Ford), *reprinted in* Subcommittee on Postal Personnel and Modernization of the Committee on Post Office and Civil Service, 96th Cong., 1st Sess., Legislative History of the Federal Service Labor-Management Relations Statute, Title VII of the Civil Service Reform Act of 1978, at 954 (1978) (hereinafter cited as *Legislative History* ); *National Treasury Employees Union v. FLRA,* 691 F.2d 553, 559 & n. 62 (D.C.Cir.1982).

Therefore, "section 7106—which retains several of management's rights under the Executive Order, but also eliminates several—[is to] be read to favor collective bargaining whenever there is doubt as to the negotiability of a subject or a proposal." H.Rep. No. 1403, 95th Cong., 2d Sess. 44 (1978), *reprinted in Legislative History, supra,* at 690.

■ The Union and amici argue that the terms "technology" and "methods and means of performing work" in the Labor Management Act were taken from the language of Executive Order No. 11491. The Union concedes that the Authority is not precluded from altering interpretations made by its predecessor, the FLRC, but it claims that there is a clear statement by Congress that interpretations by the FLRC should be respected when the Labor Management Act parallels the Executive Order. The Union correctly contends that usually when Congress adopts a new law that incorporates sections of a prior law, it is presumed to be aware of administrative interpretations of that law and to adopt those interpretations; when Congress re-enacts a statute that has a longstanding administrative interpretation, that re-enactment may well ratify the interpretation. *See Lorillard v. Pons,* 434 U.S. 575, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978). The Union also argues that § 7135(b), which provides that "decisions issued under Executive Order 11491 ... shall remain in full force and effect ... unless superseded by specific provisions of this chapter," reinforces the continued applicability of the Council's interpretations of the Executive Order.

■ We do not read § 7135(b) to prevent the Authority, as successor to the Council, from formulating its own construction of the Act. *See National Treasury Employees Union,* 691 F.2d at 562–63 n. 89 ("[w]e discern in this language no impediment to changed statutory interpretations by the Authority"). Instead, the legislative history suggests that Congress did not intend § 7135(b) to shackle the Authority, but simply to assure continuity until the Authority developed its own body of interpretive law

under the new statute. *See id.; Department of Defense v. FLRA,* 659 F.2d 1140, 1163 (D.C.Cir.1981). Given the lack of controlling effect of the Council's decisions and absent more specific legislative history on the uniform requirement, we are bound by this Congressional purpose. The duty to determine the bargainable nature of issues arising under the Labor Management Act rests squarely on the shoulders of the Authority, not the courts. *See National Treasury Employees Union,* 691 F.2d at 561.

Although the Authority's determination that the uniform requirement is nonnegotiable is entitled to considerable deference because the administrative body has the expertise and the authority to apply the broad language of § 7106 to questions of negotiability, the Authority's interpretation of the phrase "means" is not premised on an understanding of industrial complexities but instead relies on Webster. The all-important qualification put on its literal definition of means is that there be a "direct and integral" relationship between the means and the agency's mission. Because of this qualification, the Authority's interpretation does not conflict with the acknowledged view that § 7106 creates a narrow exception to the duty to bargain over the terms and conditions of employment. Having determined that the Authority acted within its delegated authority, we next consider whether its rule is the product of reasoned decision-making.

## IV

### THE AUTHORITY'S DECISION

On remand the Authority found that the requirement "that technicians must wear the military uniform while performing technician duties constitutes management's choice of a 'methods, and means of performing work' within the meaning of section 7106(b)(1) of the Statute." *Division of Military and Naval Affairs,* 15 FLRA No. 65, at 7. Quoting *National Treasury Employees Union,* 2 FLRA No. 30 (1979), the Authority found that "a 'means' is in es-

sence anything used to attain or make more likely the attainment of a desired end, and in the context of section 7106(b)(1), refers to 'any instrumentality, including an agent, tool, device, measure, plan, or policy used by the agency for the accomplishing or furthering of the performance of its work.'" 15 FLRA No. 65, at 4. The FLRA focused on the fact that technicians performed their duties in a military framework, and noted that the legislative history shows that in addition to full-time civilian work, technicians are also bound by military obligations and duties, and are available for state or federal mobilization. *See* H.Rep. No. 1823, 90th Cong., 2d Sess. 2, *reprinted in* 1968 U.S.Code Cong. & Ad. News 3318, 3319. It recognized the several court decisions that had found a rational relationship between National Guard attire and its functioning as a military organization. *See, e.g., Klotzbach v. Callaway*, 473 F.Supp. 1337 (W.D.N.Y.1979); *Syrek v. Pennsylvania Air National Guard*, 437 F.Supp. 236 (W.D.Pa.1977); *Bruton v. Schnipke*, 404 F.Supp. 1032 (E.D.Mich. 1975). Moreover, it specifically found the requirement served "to foster military discipline, promote uniformity, encourage *esprit de corps,* increase the readiness of the military forces for early deployment and enhance identification of the National Guard as a military organization." 15 FLRA No. 65, at 6.

As noted, the Council had previously required a "functional relationship" between the wearing of a uniform and the accomplishment of the Guard's mission. *See Kansas National Guard,* 5 FLRC 124 (1977); *State of New Mexico National Guard,* 5 FLRC 146, *request for reconsideration denied,* 5 FLRC 336 (1977). It had made clear its view that there was no "functional relationship between the day-to-day work performed by technicians and the requirement to wear military dress." *See, e.g., State of Ohio Air National Guard,* 6 FLRC 704 (1978). The Council had specifically rejected the Authority's rationale for finding nonnegotiability. *See, e.g., Kansas National Guard.* Instead, the question of attire was held to be a mandatory subject of bargaining except when there was a specific demonstration that wearing a uniform would be useful in the performance of the technician's duties such as during an "organizational readiness inspection." *State of Ohio Air National Guard.*

The Union claims that the Authority abandoned without explanation the requirement of close functional relationship. It also argues that the Authority failed to consider the alternative of standard civilian attire, thereby ignoring its own requirement that the subject agency show that its objective can only be accomplished by using the particular means at issue. *See, e.g., Planners, Estimators and Progressmen Association Local 8,* 13 FLRA No. 81 (1983) (the Authority found the elimination of time clocks to be a mandatory bargaining issue on the ground that the agency had not shown that its goals could be achieved only by that particular means).

■■■ When examining an agency's about-face, the general rule, as explained above, is that such changes constitute "'danger signals' that the [Agency] may be acting inconsistently with its statutory mandate" and require a "'reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored.'" *Office of Communications of United Church of Christ,* 707 F.2d at 1425 (quoting *Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 852 (D.C.Cir.1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971)). But this principle does not fully apply here because—unlike most other agencies—the FLRA has been expressly instructed by Congress to start afresh and avoid making the mistakes of its predecessor. *See AFGE v. FLRA,* 716 F.2d 47, 50 (D.C.Cir. 1983); *Brae Corp.,* 740 F.2d at 1038. Hence, we cannot say that it was arbitrary and capricious for the FLRA to find that there is a direct and integral relationship between wearing a military uniform and working within a military framework, even though its administrative predecessor held a different view.

The Union and amici also contend that the alternative of civilian attire would serve the Guard's goals while limiting the adverse effect on employees. If this is true, the Authority's failure to address that alternative in its opinion would be arbitrary, and require a remand. *See State Farm*, 103 S.Ct. at 2866; 5 U.S.C. § 7106(b)(3). It was not arbitrary for the Authority to consider it self-evident and unworthy of discussion that standard civilian attire would not "foster military discipline, promote uniformity, encourage *esprit de corps*, increase the readiness of the military forces for early deployment and enhance identification of the National Guard as a military organization."

## V

THE AUTHORITY'S FACT-FINDING PROCEDURES

We turn finally to the Union and amici's three-prong challenge to the Authority's fact-finding procedures. First, they argue that by accepting only the statements of position at its proceedings the Authority acted contrary to this Court's remand order and in violation of 5 U.S.C. § 706(2)(D) and 5 U.S.C. § 7118(a), (b). Second, they contend that the Authority failed to make appropriate findings of fact in accordance with 5 U.S.C. § 557 and 5 U.S.C. § 7118(a)(8). Finally, it is their position that the Authority's findings of fact are not supported by substantial evidence, and hence should be reversed under 5 U.S.C. § 706. We consider each of these arguments.

### A. *Failure to Conduct Appropriate Proceedings*

Regarding development of the record, our previous decision required only that the Authority "develop a full record appropriate for judicial review." 696 F.2d at 205. We did not specify the particular procedure to be used on remand, leaving it instead to administrative discretion. The Union and amici point to the fact that the Authority denied the Guard's request for a hearing before an ALJ. The Union further asserts that it was thereby "prevented through no fault of its own from adducing additional evidence," and moves for this proceeding to be again remanded for the taking of additional, material evidence. *See* 5 U.S.C. § 7123(c). It claims that had such a hearing been held it would have, for example, adduced evidence pertaining to what the job of an aircraft mechanic actually entails. Concededly, such evidence would be material, but the procedure used by the Authority in this case was similar to those it has used in resolving other negotiability disputes involving methods and means under Section 7106(b). *See, e.g., National Treasury Employees Union*, 2 FLRA No. 30. And although the Union did not waive whatever right it had to a hearing by failing to object to the procedures followed upon remand, the fact that it did not seek such a hearing and that the General Counsel, with whom it was allied, successfully objected to a hearing supports our conclusion that the procedures used were appropriate.

### B. *Failure to Make Appropriate Findings of Fact*

Section 7118(a)(8) of the Labor Management Act and 5 U.S.C. § 557(c)(3) facilitate meaningful judicial review by requiring the FLRA to set forth its findings of fact with regard to all factual issues presented by the record. The Union argues that had this Court merely wanted additional legal arguments it could have solicited these itself instead of remanding the proceeding. This argument overlooks an important purpose of the remand. It was not intended simply to develop the record. Rather, it was to give the agency that Congress entrusted with the task of making law within the interstices of the statute an opportunity to exercise its developed expertise and be the first to address the question. Moreover, the objecting parties offer no authority for their argument that the statements and affidavits in some fashion fail to constitute evidence upon which factual findings may be based. The Authority drew a number of its findings from statements of position and attached affidavits submitted by the Guard. These

findings relate to the nature and functions of the Guard and the uniform requirement as a "means" of accomplishing the Guard's mission.

### C. *Findings Supported by Substantial Evidence*

We must defer to the FLRA findings of fact "if supported by substantial evidence on the record considered as a whole." 5 U.S.C. § 7123(c). In determining whether there is substantial evidence a court must set aside a decision if it "cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, *including the body of evidence opposed to the Board's view." Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951) (emphasis added). The need to give particularized findings is especially critical when the decision constitutes an overruling of an established policy. *Adamo Wrecking Co. v. United States*, 434 U.S. 275, 287 n. 5, 98 S.Ct. 566, 574 n. 5, 54 L.Ed.2d 538 (1978). Again, substantial evidence cannot be found in conclusory rationales. *NLRB v. Yeshiva University*, 444 U.S. 672, 691, 100 S.Ct. 856, 867, 63 L.Ed.2d 115 (1980).

■ The Union and amici emphasize that the Authority rejected the factual findings made by the Panel. After hearing testimony, that body had concluded:

(1) the employer had failed to demonstrate a significant link between discipline at time of war and wearing the uniform while performing civilian technician duties,

(2) Army National Guard technicians in New York have a long history of wearing various types of civilian attire without any showing of adverse effect on their work,

(3) there is nothing in the record to demonstrate that the technicians' tasks have a significantly greater military purpose than reservists and civilian employees in the Department of Defense, who are not required to wear uniforms, and

(4) there is no record evidence that even guardsmen at civilian jobs away from the base have any particular difficulty in responding to emergency call-ups.

The Authority disregarded those findings without discussion and found that the uniform requirement fosters military discipline, promotes uniformity, encourages *esprit de corps* and increases the readiness of military forces for early deployment. If this case involved credibility determinations made by a trial examiner, the Authority's disagreement with the Panel's factual findings would be subject to considerable question. Yet, here the evaluation of the facts is a matter of weighing priorities, not assessing the demeanor of witnesses. Thus, the FLRA's findings cannot be said to be unsupported by substantial evidence. Its failure to consider and weigh the FSIP's contrary view was not fatal to its decision. In effect the Authority held that a functional relationship was not necessary for there to be a "direct and integral" relationship between wearing a uniform and the Guard's mission.

CONCLUSION

Accordingly, for the reasons stated, the petition for review is denied.