AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL–CIO, LOCAL 2441, Petitioner,

v.

FEDERAL LABOR RELATIONS AUTHORITY, Respondent.

No. 87–1820.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 7, 1988.

Decided Dec. 30, 1988.

Martin R. Cohen, with whom Mark D. Roth, Washington, D.C., was on the brief, for petitioner.

Pamela P. Johnson, Atty., Federal Labor Relations Authority, with whom William E. Persina, Acting Sol., and Arthur A. Horowitz, Associate Sol., Federal Labor Relations Authority, Washington, D.C., were on the brief, for respondent.

Before WALD, Chief Judge, and STARR and SENTELLE, Circuit Judges.

Opinion for the Court filed by Chief Judge WALD.

WALD, Chief Judge:

Reduced to its bare essentials, this case decides whether a local union can force the Bureau of Prisons to bargain over the proposed imposition of a requirement that guards wear neckties (and, in some cases, blazers) on the job. Local 2441 of the American Federation of Government Employees ("AFGE" or the "Union") petitions this court for review of an order of the Federal Labor Relations Authority ("FLRA" or the "Authority") dismissing an unfair labor practice charge against the

United States Department of Justice, Bureau of Prisons (the "Bureau"). The charge, brought by the General Counsel of the Authority, alleged that the Bureau had violated §§ 7116(a)(1) and (a)(5) of the Federal Service Labor–Management Relations Statute ("FSLMRS" or the "statute") by refusing to negotiate with the Union over the Bureau's proposed changes in uniform for correctional officers at the Federal Correctional Institute in Morgantown, West Virginia ("FCI–Morgantown"). In dismissing the unfair labor practice charge, the Authority concluded that the Bureau's uniform changes involved a "means of performing work," and as such were excepted from the Bureau's statutory duty to bargain. 5 U.S.C. § 7106(b)(1). Because we conclude that the Authority's determination was neither arbitrary nor capricious and was supported by substantial evidence, we deny the petition for review.

## I. BACKGROUND

### A. *The Statute and the Prevailing FLRA Interpretation of It*

■■■ We introduce this knotty problem by laying out the relevant substantive legal standards governing federal service labor-management relations. Once employees in a unit of the federal government have chosen by majority vote to be represented by a particular labor organization, that labor organization becomes the exclusive bargaining representative of the unit employees. 5 U.S.C. § 7111(a). The agency is required by the FSLMRS to negotiate in good faith

with that labor organization over "conditions of employment," except for those particular matters that are excluded from the duty to bargain by federal law or government-wide rules or regulations. *New York Council, Ass'n of Civilian Technicians v. FLRA,* 757 F.2d 502, 508 (2d Cir.), *cert. denied,* 474 U.S. 846, 106 S.Ct. 137, 88 L.Ed.2d 113 (1985) (*"ACT"*); 5 U.S.C. §§ 7103(a)(12), 7114(a)(4), 7117(a). The term "conditions of employment" is defined broadly to include "personnel policies, practices, and matters ... affecting working conditions." 5 U.S.C. § 7103(a)(14). If an agency refuses to negotiate in good faith with an exclusive bargaining representative as to matters covered by the duty to bargain, the agency is guilty of an unfair labor practice. 5 U.S.C. § 7116(a)(1), (a)(5).

But there are certain matters excluded from the duty to bargain; in particular, the FSLMRS contains a "management rights" provision. 5 U.S.C. § 7106. Section 7106(a) lists matters over which an agency is not permitted to bargain. Section 7106(b)(1) sets out matters over which bargaining may take place "at the election of the agency." Included in the latter category are decisions concerning the "methods, and means of performing work." 5 U.S.C. § 7106(b)(1). As to these decisions, the agency is permitted but not required to negotiate with the labor organization. *Id.; see American Federation of Gov't Employees, Local 3013 v. FLRA,* 762 F.2d 183, 183 (1st Cir.1985); *ACT,* 757 F.2d at 508.[1]

---

1. Subsections 7106(b)(2) and (b)(3) set out limitations on the management rights conferred by subsections 7106(a) and (b)(1); an agency must negotiate over "procedures" and "appropriate arrangements" in connection with its exercise of § 7106 management rights. The full text of § 7106 is as follows:

   (a) Subject to subsection (b) of this section, nothing in this chapter shall affect the authority of any management official of any agency—
   (1) to determine the mission, budget, organization, number of employees, and internal security practices of the agency; and
   (2) in accordance with applicable laws—
   (A) to hire, assign, direct, layoff, and retain employees in the agency, or to suspend, remove, reduce in grade or pay, or take other disciplinary action against such employees;

   (B) to assign work, to make determinations with respect to contracting out, and to determine the personnel by which agency operations shall be conducted;
   (C) with respect to filling positions, to make selection for appointments from—
   (i) among properly ranked and certified candidates for promotion; or
   (ii) any other appropriate source; and
   (D) to take whatever actions may be necessary to carry out the agency mission during emergencies.
   (b) Nothing in this section shall preclude any agency and any labor organization from negotiating—
   (1) at the election of the agency, on the numbers, types, and grades of employees or positions assigned to any organizational subdivision, work project, or tour of duty, or on the

The FLRA has established a two-pronged test for determining whether § 7106(b)(1) excepts a proposed practice from the agency's *duty* (though not its authority) to bargain. The first prong examines the agency's proposed change of policy, while the second examines the union's counter-proposals. *See United States Dept. of Justice, INS*, 31 F.L.R.A. 145, 152–53 (1988).

Under the first prong of the inquiry, the Authority asks whether there exists a "direct and integral relationship" between the agency's proposed new practice and the accomplishment of the agency's mission. Appendix ("App.") 18; *United States Dept. of Justice, INS*, 31 F.L.R.A. at 152. The Authority has elaborated on this "direct and integral" test by stating that a "means of performing work" under § 7106(b)(1) encompasses "anything used to attain or make more likely the attainment of a desired end, and ... refers to 'any instrumentality, including an agent, tool, device, measure, plan, or policy used by the agency for

> technology, methods, and means of performing work;
> (2) procedures which management officials of the agency will observe in exercising any authority under this section; or
> (3) appropriate arrangements for employees adversely affected by the exercise of any authority under this section by such management officials.

2. From our reading of FLRA precedent, it is unclear which provision of the statute underlies the second prong of the Authority's "two-pronged" test. In other words, what statutory authority exists for holding that an agency must bargain over union counter-proposals that do not directly interfere with the agency's mission-related purpose?

One possibility is that the test arises from § 7106(b)(3), which provides that an agency's management rights under § 7106 do not extend to "appropriate arrangements" for employees adversely affected by the agency's exercise of its management rights. A "no" answer to the "direct interference" test would mean that the union counter-proposal falls in an area expressly excepted from (b)(1), throwing the agency back on its general duty to bargain over conditions of employment. Two early FLRA uniform cases invoked (b)(3), stating that (b)(3) applies to all union counter-proposals except those that would "prevent the agency from acting at all." *National Treasury Employees Union*, 2 F.L.R.A. 255, 260 (1979); *see American Federation of Gov't Employees*, 8 F.L.R.A. 347, 350–51 (1982),

the accomplishing or furthering of the performance of its work.' " *Division of Military and Naval Affairs, State of New York*, 15 F.L.R.A. 288, 291 (1984) (quoting *National Treasury Employees Union*, 2 F.L.R.A. 255, 258 (1979)), *aff'd sub nom. ACT*, 757 F.2d 502 (2d Cir.), *cert. denied*, 474 U.S. 846, 106 S.Ct. 137, 88 L.Ed.2d 113 (1985); *see* App. 18.

If the Authority determines that the proposed agency policy does bear a "direct and integral relationship" to the agency's mission, then it proceeds to the second prong of the inquiry, asking whether the counter-proposal advanced by the union would "directly interfere" with the mission-related purpose of the agency's new practice. App. 20–21; *American Federation of Gov't Employees*, 25 F.L.R.A. 1028, 1031 (1987). If it would, then the agency has no duty to bargain; if it would not, then the agency must bargain over the counterproposal and is guilty of an unfair labor practice so long as it refuses to do so. *Id.*[2]

*rev'd as to other matters*, 709 F.2d 724 (D.C.Cir. 1983). Subsection (b)(3) is a plausible source for the second prong of the FLRA test because (b)(3) has been held to carve out an exception to the management rights conferred by (b)(1). *Association of Civilian Technicians, Montana Air Chapter v. FLRA*, 756 F.2d 172, 179–80 (D.C.Cir. 1985).

Another possibility exists, however: that the second-prong test is rooted in (b)(1) itself. Some recent FLRA (b)(1) cases have not cited (b)(3) at all, holding that an agency has a duty to negotiate over union counter-proposals that would not "directly interfere" with the agency's exercise of its (b)(1) rights. *See, e.g., United States Dept. of Justice, INS*, 18 F.L.R.A. 29, 30 (1985); *Long Beach Naval Shipyard*, 17 F.L.R.A. 511, 513–14 (1985). A reading of these cases suggests that the second prong of the Authority's test is not tied to (b)(3) but instead constitutes an application of the first-prong "direct relationship" test to the *union's*, as opposed to the *agency's*, proposal. By this view, a "no" answer to the "direct interference" test would mean that the union counter-proposal does not fall under (b)(1) at all. The result would be the same as with the above-mentioned (b)(3) theory: the agency would be thrown back on its general duty to bargain over conditions of employment. Among the evidence supporting the (b)(1) theory is one recent case hinting that (b)(1), not (b)(3), supplies the "direct interference" test. *See American Federation of Gov't Employees*, 25 F.L.R.A. 1028, 1032 (1987) (having found that union proposal did not "directly interfere" with

In applying the "direct interference" test, the Authority has required agencies to bargain over union proposals that would tinker with agency policy without defeating its purpose. *See United States Dept. of Justice, INS,* 31 F.L.R.A. at 147, 153; *American Federation of Gov't Employees,* 25 F.L.R.A. at 1030–31. More disruptive adjustments to agency policy have been held to be outside the agency's duty to bargain, on grounds of "direct interference." *See National Treasury Employees Union,* 8 F.L.R.A. 3, 4–5 (1982). And, not surprisingly, the Authority has held consistently that a union proposal to abolish an agency policy or render it merely voluntary would constitute direct interference and thus falls outside the duty to bargain. *See American Federation of Gov't Employees, Local 217,* 21 F.L.R.A. 62, 67 (1986); *National Treasury Employees Union,* 8 F.L.R.A. at 3–4; *National Treasury Employees Union,* 2 F.L.R.A. at 260.

The FLRA's "two-pronged" interpretation of § 7106(b)(1) is not at issue in this case. *See, e.g., ACT,* 757 F.2d at 509–10 (finding the "direct and integral relationship" test consistent with congressional intent to make § 7106(b)(1) a narrow exception to the duty to bargain); *see also* Union Br. 11; Reply Br. 7. The Union challenges only the Authority's application of the test to the facts of the case.[3]

## B. *Facts of This Case*

It is time, then, to roll up our sleeves and grapple with the FCI–Morgantown dispute.

FCI–Morgantown is a low-security prison populated by some 350–400 inmates convicted of nonviolent federal crimes. App. 11, 88–89. Correctional officers there are assigned to various posts, some of which involve daily contact with the public, others with inmates only. App. 12, 69–71, 83–84. Local 2441 of the AFGE is the exclusive representative of the employees of FCI–Morgantown.

The uniform dispute which is the centerpiece of this case has a complicated history. At all relevant times there has been a national uniform for Bureau of Prisons guards. This standard uniform consisted of a navy blue blazer, charcoal gray pants, a blue, white or yellow shirt (long-sleeves in winter and short-sleeves in summer), black shoes, black socks, a black belt, and a black or maroon necktie. App. 12, 327–36. In fact, however, FCI–Morgantown did not observe or enforce all the requirements of the standard uniform for several years prior to October 1985. Specifically, most officers did not wear the blazer and necktie while on duty. All of them did, however, wear the regulation charcoal pants, blue, white or yellow shirt, black shoes, black socks, and black belt. App. 12–13, 63–64, 81–83, 106–07, 158–59.

On or about October 30, 1985, the management of FCI–Morgantown issued draft regulations (the "Proposed Regulations") setting out changes in *required* uni-

---

(b)(1) management rights and that agency therefore must bargain, Authority "d[id] not reach the issue" of whether union proposal was an "appropriate arrangement" under (b)(3)). On other hand, several recent cases—while not invoking (b)(3)—cite the early FLRA cases that do rely on (b)(3). *See, e.g., United States Dept. of Justice, INS,* 18 F.L.R.A. at 30; *Long Beach Naval Shipyard,* 17 F.L.R.A. at 514. Indeed, the Administrative Law Judge's ("ALJ") opinion in the present case cites the 1979 *Treasury Employees* case, which in turn relies on (b)(3). App. 20.

Despite the lack of clarity in the prior rulings, neither the Bureau nor the Union challenged the Authority's enunciated standards in this case. Moreover, there may be no practical difference between the old "acting at all" test and the current "direct interference" test. At any rate, this record does not call on us to question the Authority's statutory interpretation.

3. We note, in passing, that this case is distinguishable from *American Federation of Gov't Employees, Local 32 v. FLRA,* 853 F.2d 986 (D.C. Cir.1988), which rejected the FLRA's determination that certain matters acknowledgedly not falling within the management rights provision of § 7106 (nor the exemption provision of § 7117) were not mandatory subjects of bargaining. *Id.* at 990–91. There, the FLRA asserted an inherent (*i.e.,* not statutorily defined) authority to create a nonstatutory exception to the duty to bargain, where bargaining with a union would somehow diminish the agency's power to determine the working conditions of employees outside the bargaining unit. *Id.* at 991. Here by contrast, the Authority points to § 7106 as the source of its determination that the Bureau did not have to bargain over the uniform changes. *Local 32* is therefore inapposite. *Cf.* Union Reply Br. 1–2.

forms. App. 285–88.[4] The key components of the Proposed Regulation wardrobe were as follows: (i) specific winter and summer uniforms, (ii) a long-sleeved shirt and necktie throughout the winter season (an officer could, at his option, wear a blazer), (iii) neckties always to be worn with long-sleeved shirts, (iv) neckties whenever blazers are worn, (v) blazers and neckties year-round to be worn by officers who occupy posts involving contact with the public, and (vi) no uniforms worn in public except while on duty, on official business, or commuting to and from work. App. 285–86.

On or about November 27, 1985, the Union delivered to the warden at FCI–Morgantown a written request to negotiate over the Proposed Regulations. App. 289. The warden responded on December 3 that the Bureau of Prisons would negotiate as to the "impact and implementation" of the uniform changes, but would not negotiate over the substance of the changes. App. 13, 71–74, 289–90.[5]

The Union responded on December 11, contending that its right to negotiate was not limited to impact and implementation matters. App. 13, 75–76, 291–95. Attached to the Union's written response was a set of counter-proposals, App. 292–94, stating that the Union "oppose[s] the summer/winter concept and the mandatory use of neckties" and proposing that the paragraph establishing a wintertime necktie requirement for all officers be deleted. App. 293. The Union also proposed deleting the

requirement of blazers and neckties for officers in daily contact with the public. *Id.*[6]

The next day, the warden wrote the Union that the substance of the Proposed Regulations was nonnegotiable and asserted that the Union's counter-proposal to make blazers and neckties optional was nonnegotiable as well. (He did, at the same time, indicate that the Bureau deemed several of the Union's other counter-proposals acceptable and would incorporate them into the regulations.) App. 77, 296. Although the warden later said he was willing to bargain over the impact and implementation of the Proposed Regulations, no negotiations took place before issuance of the final version of the regulations (the "Revised Regulations") on February 2, 1986, which were in all but one relevant respect identical to the proposed ones listed above. App. 14, 79.[7] The clothing requirements set out in the Revised Regulations went into effect immediately. App. 297.

### C. *Proceedings Before the Authority*

The General Counsel of the FLRA filed an unfair labor practice complaint against the Bureau, alleging that it had violated §§ 7116(a)(1) and (a)(5) of the statute by refusing to negotiate over the substance of the Proposed Regulations, by refusing to negotiate over the Union's counter-proposals, and by unilaterally implementing the Revised Regulations. App. 10–11, 309–19. Before the ALJ who heard the case, the

---

4. The Proposed Regulations were dubbed an "Institution Supplement," a label that apparently is attached to regulations issued by a particular prison pursuant to nationwide Bureau of Prisons regulations. *See* App. 285 (cross-referencing the nationwide uniform clothing standard).

5. The phrase "impact and implementation" is usually applied to bargaining over "appropriate arrangements" under § 7106(b)(3). It is unclear whether subsection (b)(3) applies to this case. *See supra* note 2. Putting aside its use as a term of art, it appears that the Bureau used the "impact and implementation" phrase to refer to such matters as whether the Bureau would issue uniforms or would instead give correctional officers allowances from which they could purchase the uniforms themselves.

*See* App. 150 (hearing testimony of Bureau employee Carl Swick).

6. Paragraph 4F of the Proposed Regulations prescribed winter and summer seasons and set out the requirement that all officers wear neckties in winter. App. 286. The Union counter-proposal stated: "[O]ur initial proposal is to delete item 4.F." App. 293. Paragraph 4G of the Proposed Regulations set out the year-round blazer-and-necktie requirement for officers at posts involving contact with the public. App. 286. As to paragraph 4G, the Union's counter-proposal stated: "See item 4.F. above." App. 293.

7. The prohibition against wearing uniforms while off duty was omitted from the revised version. App. 298–300.

General Counsel argued that the uniform changes were not a "means of performing work" under § 7106(b)(1), because the Bureau had failed to show that the absence of blazers and neckties had contributed to inmate relations problems at FCI–Morgantown. App. 18.

Following the hearing, the ALJ concluded that the Bureau had not engaged in an unfair labor practice and dismissed the complaint. App. 10–22. After outlining the legal standards discussed in Part I.A. of this opinion, *supra*, the ALJ determined that the mission of FCI–Morgantown is "to provide for the care and custody of Federal inmates." App. 19. The Bureau's changes in uniform requirements, the ALJ observed, "were designed to improve the image of Correctional Officers with the inmates and public and facilitate their cooperation." App. 19. According to the ALJ, this established a "direct relationship" between the new uniform requirements and the Bureau's mission. App. 19–20. He characterized the Union's counter-proposals as insisting "that no change be made, that is, that employees continue to be able to elect [whether] to wear the blazer and tie in all circumstances." App. 20. This, he held, would "totally abrogate" the Bureau's management rights under § 7106(b)(1). *Id.* Ultimately, the ALJ concluded, the facts of the present case satisfied the "means of performing work" language of § 7106(b)(1). App. 19–20. Since the Bureau could elect not to bargain, he concluded, its failure to negotiate did not violate §§ 7116(a)(1) and (a)(5) of the statute. App. 20.

On review, the Authority affirmed the ALJ's dismissal of the complaint, with one member in dissent. *United States Dept. of Justice, Kennedy Center, Federal Correctional Institution, Bureau of Prisons,* 29 F.L.R.A. 1471 (1987); App. 1–6. The decision of the Authority adopted the findings and conclusions of the ALJ. App. 1.

## II. Discussion

### A. *Standard of Review*

■ The FSLMRS requires that orders of the FLRA be reviewed in accordance with § 706 of the Administrative Procedure Act, 5 U.S.C. § 706. *Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms v. FLRA,* 857 F.2d 819, 820–21 (D.C.Cir.1988); 5 U.S.C. § 7123(c). Thus, an FLRA decision is to be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). *See Department of the Treasury,* 857 F.2d at 821; *EEOC v. FLRA,* 744 F.2d 842, 847 (D.C.Cir.1984), *cert. dismissed,* 476 U.S. 19, 106 S.Ct. 1678, 90 L.Ed.2d 19 (1986). Findings of fact are conclusive "if supported by substantial evidence on the record considered as a whole." 5 U.S.C. § 7123(c). As with the National Labor Relations Board, the FLRA's reasonable inferences are to be deferred to on review. *See NLRB v. United States Postal Service,* 841 F.2d 141, 144 (6th Cir.1988). On the other hand, the reviewing court must consider the entire record, including evidence opposed to the FLRA's view. *ACT,* 757 F.2d at 512; *see Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951).

### B. *Direct and Integral Relationship Test*

■ The ALJ's opinion, which was adopted by the Authority, employed the FLRA's traditional two-pronged test for determining whether an agency has to negotiate under § 7106(b)(1); it concluded that the new uniforms were a "means of performing work." We begin by determining whether substantial evidence exists in the record taken as a whole to support the ALJ's conclusion that the new uniform requirements were "directly and integrally related" to the Bureau's mission. We hold that the evidentiary support is sufficient.

The mission of FCI–Morgantown is, as the ALJ stated and as the Union acknowledges, "to provide for the care and custody of Federal inmates." App. 19; Union Br. 16. The Bureau's purpose for imposing the new uniform standards was to improve the image of correctional officers among the inmates and among the general public. This assertedly would enable correctional officers to receive a greater degree of coop-

eration from the inmates and the public. App. 16.[8]

A witness testifying for the Bureau provided the needed link between "image" and "cooperation." Carl Swick, a labor relations specialist for the Bureau, was asked in what way the new uniform standards could be considered methods and means of performing work. He responded as follows:

[The new uniform] does two things. One ... has to do with the image that we present to the inmate population. We are interested in a less threatening, less authoritarian type impact for correctional officers working with the inmates. We believe that that helps the employees from the standpoint that the inmates are more inclined to follow their instructions [and] to interact in a less threatened or less hostile manner if the employees are dressed in the current uniform than in the previous uniform.

... [As to officers in posts involving contact with the public], whenever one of our employees is visible in the community or is visible to the community, the uniform he or she is wearing presents an image of the Bureau of Prisons, which ties in with the way the community responds to us. It impacts on the way we are able to do our duties, to perform our duties with the inmates. It has to do with a favorable image in the community, a favorable image with the press. When the community or the press gets a negative view of a correctional organization, there is an awareness on the part of the inmates who read the newspapers carefully and who try to find out how they are viewed in the public and by the public and in the press.

All of the contact or visibility issues that are discussed and are considered in dictating which posts should wear a tie, for instance, or should wear a blazer,

have to do with how our officers are going to be received or our employees are going to be received by the inmates ... [or] how they are going to be received by members of the public with whom they come in contact....

App. 153–55.

To be sure, Mr. Swick's testimony is not without weaknesses. For example, the context suggests that he held the erroneous impression that the prior uniform at FCI–Morgantown was a police- or military-style uniform. *See, e.g.,* App. 152–53 (Mr. Swick's reference to the new uniforms as "less authoritarian"). Nonetheless, his misunderstanding as to the prior uniforms does not detract from his testimony that inmates do respond well to officers dressed in the new style of uniform. His testimony recounted that uniforms do affect inmate attitudes and that those attitudes translate directly into inmates' willingness to follow directions. Measures that make inmates "more inclined to follow [officers'] instructions" are directly and integrally related to the mission of a prison. As to officers in contact with the public, Mr. Swick's testimony was even stronger: it stressed the links between the uniforms worn by officers in public-contact posts, the opinions of the public and press, and the attitudes of inmates. Overall, Mr. Swick's testimony is sufficient to ground a finding that there is a "direct and integral relationship" between uniforms that include neckties (and, for officers in public-contact posts, blazers) and the capability of correctional officers to control the inmates.

Common sense complements Mr. Swick's testimony. The Authority could rationally conclude that guard-inmate relations affect prison morale and that, all other things being equal, guards inspire more respect if they wear uniforms that convey a polished (albeit relaxed), official-looking image. (In

---

**8.** Another purpose advanced by the Bureau was to facilitate identification of correctional officers in the course of an emergency. App. 16, 170–71. While the "facts" section of the ALJ's opinion did mention this as one of the Bureau's asserted purposes, the ALJ's conclusions did not rely on it to reach its "means of performing work" finding. App. 19–20. The FLRA's brief nonetheless cites it as one purpose underlying the new uniform standards, FLRA Br. 24–25, 29, while the Union argues that it was not a ground of the Authority's decision. Union Br. 31 n. *. We conclude that the emergency identification rationale was not a ground for the FLRA's action.

the words of George M. Cohan, "You won't do any business, if you haven't got a band; the folks expect a street parade and uniforms so grand.") We accord weight to the expertise of the Authority so long as its conclusions are rationally based, grounded on articulated facts and consistent with the FSLMRS. *See NLRB v. Yeshiva University*, 444 U.S. 672, 691, 100 S.Ct. 856, 867, 63 L.Ed.2d 115 (1980).

The Union did present arguments and evidence to counter the Bureau's assertions, but the Authority found them wanting. Union witnesses testified that they knew of no circumstances under which the lack of blazers and neckties had interfered with job duties. App. 64–65, 120–21, 181–82; *see also* Union Br. 29 (emphasizing lack of evidence linking past discipline problems to uniforms). We fail, however, to see how the "direct and integral" standard requires such proof. The Second Circuit did not require such evidence in *ACT*, 757 F.2d 502, where civilian technicians in the New York National Guard challenged the imposition of a requirement that they wear uniforms. The union in that case advanced an identical argument that the lack of uniforms had not interfered with technicians' duties in the past, but it was rejected by the court, which stated that the statutory standard is met where a policy is "used to attain or make more likely the attainment of a desired end" or is "used by the agency for the accomplishing or furthering of the performance of its work." *Id.* at 509–10. Similarly, we do not find that the FLRA must document the need for uniforms with past instances of trouble in order to find the "direct and integral relationship" required by § 7106(b)(1). Put simply, the fact that FCI–Morgantown is a low-security prison without a history of uprisings does not negate the Bureau's compelling interest in maintaining and enhancing healthy guard-inmate relations in the future.

The Union also argues that the FLRA's "direct and integral relationship" finding

between uniforms and agency mission is belied by the Bureau's policy of still making neckties optional for certain officers wearing short-sleeved shirts in the summertime. The Union's argument would fare better if "integral" meant "indispensable," but neither the FLRA nor the Second Circuit has read the "direct and integral relationship" test so narrowly. Making neckties optional in the warm summer months is a reasonable concession to the exigencies of prison life: the main goal of uniform uniforms—summer or winter—remains intact.[9]

The Authority's finding of a direct and integral relationship in this case was consistent with FLRA precedent. The Authority has held uniform clothing requirements to be "means of performing work" under § 7106(b)(1) where it has been shown that they could help accomplish or further the performance of an agency's work. Thus, civilian military technicians in the National Guard were required *sans* negotiation to wear uniforms, because uniforms would "foster military discipline, promote uniformity, encourage *esprit de corps*, increase the readiness of the military forces for early deployment and enhance identification of the National Guard as a military organization." *Division of Military and Naval Affairs, State of New York*, 15 F.L. R.A. at 293. Officers of the Immigration and Naturalization Service were required to wear badges because they would "provide for the identification of . . . officers and . . . facilitate the work of supervisory personnel in making assignments for the officers, and in conducting on-site inspections." *American Federation of Gov't Employees*, 8 F.L.R.A. at 350. And Customs Service officers were required to wear nameplates, because they would "personalize the Customs Service and . . . facilitate the public's dealings with uniformed officers." *National Treasury Employees Union*, 2 F.L.R.A. at 257. On the other hand, where an agency offers no evidence

---

9. The Union also contended that neckties and blazers could be disadvantageous in a physical confrontation and that they would be uncomfortable. App. 71–72, 85–86, 121. The ALJ, while acknowledging these arguments, found them outweighed by the Bureau's purposes. App. 16, 19–20. We decline to second-guess this finding.

linking clothing to work performance, it cannot look to § 7106(b)(1) for relief from the duty to bargain. *See Veterans Administration*, 23 F.L.R.A. 278, 297 (1986) (agency offered no evidence that wearing of nonuniform sweaters by hospital housekeeping aides would interfere with work).

In sum, we find substantial evidence in the record to support the FLRA finding of a "direct and integral relationship" between neckties (and, for officers in public-contact posts, blazers), better inmate morale, and the Bureau's mission of providing for the care and custody of inmates. Even the lone dissenter on the FLRA accepted the Authority's determination as to the first prong, the relationship between the uniform requirement and the "means of performing work" test.

### C. Direct Interference Test

■ The second prong of the § 7106(b)(1) test examines the counter-proposals advanced by the Union and asks whether acceptance of them would "directly interfere" with the purpose behind the disputed requirements. The Authority concluded on this record that the Union's proposals would so interfere. Here again, we find the Authority's conclusion to be supported by substantial evidence.

To recapitulate, the Union proposed eliminating both the requirement that all officers wear neckties in winter and the requirement that officers in public-contact posts wear blazers and neckties year-round. App. 293. In the ALJ's words, the Union's proposal was "that no change be made, that is, that employees continue to be able to elect [whether] to wear the blazer and tie in all circumstances." App. 20.

The ALJ concluded—rationally, we believe—that the Union's counter-proposals would directly interfere with the accomplishment of the Bureau's purpose. This conclusion is virtually a truism, given the results of the first prong of the test. Having found that a necktie requirement (and, for officers in public-contact posts, a blazer requirement) was directly and integrally related to the performance of the Bureau's mission, it follows naturally—indeed reflex-

ively—that the Union's proposal to eliminate those requirements completely would directly interfere with the Bureau's purpose. *See* App. 20 (ALJ: Union proposal "would totally abrogate" Bureau's rights under § 7106(b)(1)). The reflexive relationship between the first and second prongs of the test has been implicitly recognized in prior FLRA decisions involving union counter-proposals that called for a return to the *status quo ante. See American Federation of Gov't Employees, Local 217*, 21 F.L.R.A. 62, 67 (1986) (proposal to make wearing of uniform optional for certain employees would directly interfere with § 7106(b)(1) rights, given finding of direct and integral relationship); *National Treasury Employees Union*, 8 F.L.R.A. at 3-4 (same for proposal to make wearing of uniform hats optional for certain employees); *National Treasury Employees Union*, 2 F.L.R.A. at 260 (proposal to make wearing of nameplates optional "would, in effect, empower employees to nullify" the nameplate requirement and thus would directly interfere with the mission-related purpose of the nameplates). This is not to say that the second prong is meaningless. In most cases, the "direct interference" test would have teeth, *i.e.*, if the Union had proposed variations to the new uniform requirements, such as cotton poplin blazers rather than wool ones, or gray instead of navy blue ones. By proposing the complete elimination of blazer and necktie requirements, however, the Union preordained the result of the application of the second prong of the § 7106(b)(1) test.

Again, as with the first prong of the test, we find the Authority's decision here to be consistent with its prior rulings. FLRA precedents make clear that the aim of the "direct interference" prong of the test is to inquire whether a union counter-proposal permits the accomplishment of the agency's mission-related purpose while modifying some particulars of its policy. Thus, the INS purpose of identifying officers for administrative purposes would not be defeated if the identification plates bore numbers rather than officers' names. *American Federation of Gov't Employees*, 8 F.L.R.A. at 350. The Customs Service purpose

of personalizing relations with travelers would not be defeated if the identification plates bore first names and last initials, or even pseudonyms. *National Transportation Employees Union,* 2 F.L.R.A. at 261. The INS purpose of making officers' appearance command respect and cooperation would not be defeated by having officers wear green denim jeans "essentially identical ... in appearance" to the standard uniform trousers. *United States Dept. of Justice, INS,* 31 F.L.R.A. at 147, 153. And the purpose of making firefighters identifiable would not be defeated by allowing tee-shirts and ballcaps with agency insignia to be worn when officers are not in contact with the public. *American Federation of Gov't Employees,* 25 F.L.R.A. at 1030–31. All of these cases are clearly distinguishable from this one for the simple reason that the Union here did not present a limited counter-proposal but instead proposed that guards be given the option of eliminating neckties and blazers altogether. Thus, the Authority's ruling in the present case did not swerve from the path of its prior decisions.

Lastly, we reject the argument raised by the dissenting member of the FLRA, and by the Union before this court, that the elimination of a necktie requirement for officers in nonpublic posts would not directly interfere with the Bureau's purpose. *See* App. 5–6 (dissenting opinion of member McKee); Union Reply Br. 7–9. To begin with, the Union never advanced a proposal that neckties be retained for officers in public-contact posts and eliminated only for officers in nonpublic posts. *See* App. 22 (ALJ reference to the absence of such a counter-proposal). Where a union's broad proposal would directly interfere with an agency's purpose, we will not divide the proposal up and order the agency to bargain over the noninterfering portions of it. To do so would charge an agency with an unfair labor practice for refusing to bargain over a counter-proposal that was never presented to it. But, more fundamentally, our conclusion that the Bureau made its case that the necktie requirement is directly and integrally related to its purpose necessarily compels the conclusion that its

elimination would directly interfere with that purpose.

## III. Conclusion

Substantial evidence supports the FLRA's determination that neckties and blazers are directly and integrally related to FCI–Morgantown correctional officers' performance of their work. Second, the Authority's determination that the Union counter-proposals to eliminate both requirements would directly interfere with the Bureau's purpose in imposing the uniform requirements was similarly supported by substantial evidence. Consequently, Thoreau's sartorial advice—"beware of all enterprises that require new clothes"—notwithstanding, the petition for review is

DENIED.